IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA18-1045

Filed: 31 December 2020

Wake County, No. 18 CVD 600773

M.E., Plaintiff-Appellant,

v.

T.J., Defendant-Appellee.

Appeal by Plaintiff from order entered 7 June 2018 by Judge Anna Worley in

District Court, Wake County. Heard in the Court of Appeals 17 September 2019.

*Sharff Law Firm, PLLC, by Amily McCool, and ACLU of North Carolina Legal Foundation, Inc., by Emily E. Seawell and Irena Como, for Plaintiff-Appellant.*

*Lorin J. Lapidus, court appointed amicus curiae.*

*Governor Roy A. Cooper, III, and Attorney General Joshua H. Stein, by Deputy Solicitor General Ryan Y. Park, for North Carolina Department of Justice, amicus curiae.*

*Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., by Sarah M. Saint and Eric M. David, and Equality NC, by Ames B. Simmons, for North Carolina LGBTQ+ Non-Profit Organizations, amici curiae.*

*Womble Bond Dickinson, by Amalia Manolagas, Kevin Hall, pro hac vice, and Allen O'Rourke, Legal Aid of North Carolina, by Celia Pistolis, Amy Vukovich, and Elyisa Prendergast-Jones, and North Carolina Coalition Against Domestic Violence, by Sherry Honeycutt Everett, for Legal Aid of North Carolina, North Carolina Coalition Against Domestic Violence, and several local domestic violence support organizations, amici curiae.*

McGEE, Chief Judge.

I. Factual and Procedural Background

A. *Introduction*

M.E. ("Plaintiff") and T.J. ("Defendant") were in a dating relationship that did not last. Plaintiff decided the relationship had reached its end and, on 29 May 2018, Plaintiff undertook the difficult task of informing Defendant that their relationship was over. According to Plaintiff, Defendant did not accept Plaintiff's decision, and responded in a manner that ultimately led Plaintiff to visit the Wake County Clerk of Court's office on the morning of 31 May 2018, seeking the protections of a Domestic Violence Protective Order ("DVPO"), as well as an *ex parte* temporary "Domestic Violence Order of Protection" ("*ex parte* DVPO"), pursuant to Chapter 50B of the North Carolina General Statutes: "An Act to Provide Remedies for Domestic Violence" (the "Act" or "Chapter 50B"). 1979 North Carolina Laws Ch. 561, §§ 1–8. At the time of the enactment of Chapter 50B, same-sex marriage was not legal, and the General Assembly specifically limited the protections of Chapter 50B to unmarried couples comprising "persons of the opposite sex." *Id.*

Although the trial court determined Plaintiff's "allegations [we]re significant," and "[P]laintiff ha[d] suffered unlawful conduct by [D]efendant," the trial court denied Plaintiff's request for an *ex parte* DVPO. The order denying Plaintiff's request for an *ex parte* DVPO states that the "only reason [P]laintiff [is] not receiving [an *ex parte*] 50B DVPO today" is because Plaintiff and Defendant had been in a "same sex relationship and [had] not live[d] together[.]" Plaintiff received the same result at a

7 June 2018 hearing on her request for a permanent DVPO. The trial court denied Plaintiff the protections of a Chapter 50B DVPO in a 7 June 2018 order that stated: "A civil no-contact (50C) order was granted contemporaneously on the same allegations and had the parties been of opposite genders, those facts would have supported the entry of a [DVPO] (50B)." As the trial court note, it contemporaneously entered a "No-Contact Order for Stalking" granting Plaintiff the lesser protections afforded by Chapter 50C.

On appeal, Plaintiff argues that the denial of her requests for *ex parte* and permanent DVPOs under Chapter 50B violated her Fourteenth Amendment and state constitutional rights to due process and equal protection of the laws. We set forth additional relevant facts and address Plaintiff's arguments below.

B. *Additional Facts*

Plaintiff went to the Clerk's office on 31 May 2018 and explained her situation to the staff members, who gave Plaintiff the appropriate forms to file a Chapter 50B "Complaint and Motion for Domestic Violence Protective Order" ("AOC-CV-303"), which also includes a section to request a temporary "Ex Parte Domestic Violence Order of Protection." *See* N.C.G.S. § 50B-2(d) (2017) ("The clerk of superior court of each county shall provide to pro se complainants all forms that are necessary or appropriate to enable them to proceed pro se pursuant to this section. The clerk shall,

3

whenever feasible, provide a private area for complainants to fill out forms and make inquiries.").

Plaintiff filled out AOC-CV-303 and additional forms she had been given, alleging Defendant had committed physical and otherwise threatening actions against her, and stating her concern that Defendant had "access to [Defendant's] father's gun collection." Plaintiff requested "emergency relief" by way of "an Ex Parte Order," based upon her belief that "there [wa]s a danger of [further] acts of domestic violence against [her]" before a formal DVPO hearing could be set. Plaintiff stated: "I want [] [D]efendant ordered not to assault, threaten, abuse, follow, harass or interfere with me[;]" "I want [] [D]efendant to be ordered to have no contact with me." Plaintiff also asked the trial court to order Defendant "not to come on or about" Plaintiff's residence or her place of work; to take anger management classes; and "to prohibit [] [D]efendant from possessing or purchasing a firearm."

Form AOC-CV-303 is based on the requirements for a DVPO as set forth in Chapter 50B, including the definition of "domestic violence" found in N.C.G.S. § 50B-1. The definition of "domestic violence" in N.C.G.S. § 50B-1 includes acts by a defendant "[a]ttempting to cause bodily injury, [] intentionally causing bodily injury[, or] [p]lacing the aggrieved party . . . in fear of imminent serious bodily injury or continued harassment . . . that rises to such a level as to inflict substantial emotional distress" when the defendant's acts were against a "person," the plaintiff, with whom

the defendant was in a "personal relationship." N.C.G.S. §§ 50B-1(a)(1)-(2). Relevant to Plaintiff's appeal, the definition of "personal relationship" required that Plaintiff and Defendant were either "in a dating relationship or had been in a dating relationship." N.C.G.S. §§ 50B-1 (b)(6). Therefore, pursuant to the definitions in N.C.G.S. § 50B-1, violence against a person with whom the perpetrator either is, or has been, in a "dating relationship" is not "domestic violence," no matter how severe the abuse, *unless* the perpetrator of the violence and the victim of the violence "[a]re persons of the opposite sex[.]" N.C.G.S. § 50B-1(b)(6). The only box on AOC-CV-303 relevant to the "dating" nature of Plaintiff's relationship with Defendant was the one that stated: "The defendant and I . . . are persons of the opposite sex who are in or have been in a dating relationship." Having no other option, Plaintiff checked that box and filed her complaint.

Plaintiff first spoke with the trial judge concerning her "request for Ex Parte Order" during the morning family court session on 31 May 2018, but was informed that because both she and Defendant were women, and only in a "dating" type relationship, N.C.G.S. § 50B-1(b)(6) did not allow the trial court to grant her an *ex parte* DVPO or any other protections afforded by Chapter 50B. Plaintiff was informed that she could seek a civil *ex parte* temporary no-contact order and a permanent civil no-contact order, pursuant to Chapter 50C. *See* N.C.G.S. § 50C-2 (2017). Chapter 50C expressly states that its protections are for "person[s] against whom an act of

unlawful conduct has been committed by another person *not involved in a personal relationship* with the person *as defined in G.S. 50B-1(b)*." N.C.G.S. § 50C-1(8) (2017) (emphasis added).

Plaintiff returned to the Clerk's office, obtained the forms for Chapter 50C protections, including Form AOC-CV-520, "Complaint for No-Contact Order for Stalking," filled them out, and filed them. Plaintiff's motions for both civil *ex parte* and permanent no-contact orders were filed under a new case file number. Plaintiff decided to argue for both an *ex parte* DVPO and a permanent DVPO under Chapter 50B and, should these Chapter 50B requests be denied, for Chapter 50C *ex parte* and permanent civil "Temporary No-Contact Order[s] for Stalking."

Plaintiff's actions were heard at the afternoon session that same day, 31 May 2018, and the trial court entered its "'Amended' Ex Parte Domestic Violence Order of Protection," which denied Plaintiff's request for an *ex parte* DVPO, but set a hearing date of 7 June 2018 for a hearing on Plaintiff's request for a permanent DVPO.[1] In the "Relationship to Petitioner" section of this order, the box checked by the trial court to define Plaintiff's relationship to Defendant was "of opposite sex, currently or formerly in dating relationship[.]" The trial court also checked Box 8, which states that "[P]laintiff has failed to prove grounds for ex parte relief[;]" Box 14, stating "the

---

[1] This order had "Amended" handwritten at the top of the order, likely because the original date set for the hearing of Plaintiff's "Complaint and Motion for Domestic Violence Protective Order," 12 June 2018, was changed by hand on the order to 7 June 2018.

6

request for Ex Parte Order is denied[;]" and Box 15, "Other: *(specify)*[,]" writing: "HEARING ONLY – set for hearing on [7 June 2018] . . .; allegations are significant but parties are in same sex relationship and have never lived together, therefore do not have relationship required in [N.C.G.S. § 50B-1(b)]."

The trial court granted Plaintiff's *ex parte* request pursuant to Chapter 50C by entering a "Temporary No-Contact Order for Stalking or Nonconsensual Sexual Conduct" (the "*ex parte* 50C Order"), also on 31 May 2018. *See* N.C.G.S. § 50C-6(a) (2017). In the *ex parte* 50C Order, the trial court found as fact that "[P]laintiff has suffered unlawful conduct by [] [D]efendant in that:" "On 5/29/18, [D]efendant got physically aggressive and was screaming in [Plaintiff's] face; [D]efendant then left after LEO [law enforcement officers] were called; after LEO left," Defendant "attempted to re-enter [Plaintiff's] house; LEO returned to remove [Defendant] from [Plaintiff's] house; since that date, [D]efendant has repeated[ly] called [Plaintiff], texted [P]laintiff from multiple numbers, and contacted [P]laintiff's friends and family[.]" The trial court found that Defendant "continues to harass [P]laintiff[,]" and that "[D]efendant committed acts of unlawful conduct against [] [P]laintiff." The trial court concluded that the "*only reason [P]laintiff [is] not receiving [a] 50B DVPO today*" *is because Plaintiff and Defendant had been* "*in [a] same sex relationship and do not live together*[,]" and that N.C.G.S. § 50B-1(b), as plainly written, requires the dating

relationship involved to have consisted of people of the "'opposite sex[.]'" (Emphasis added).

The "HEARING ON [Plaintiff's] 50B and 50C MOTIONS" was conducted on 7 June 2018. At this hearing, the trial court considered Plaintiff's "Complaint for No-Contact Order for Stalking or Nonconsensual Sexual Conduct" under N.C.G.S. §§ 50C-2 and 50C-5, and her "Complaint and Motion for Domestic Violence Protective Order" under N.C.G.S. §§ 50B-2 and 50B-3. Defendant appeared *pro se*, but Plaintiff was represented at this hearing, and her attorney informed the trial court:

> [Plaintiff] came in on May 31st and filed a complaint for that [DVPO]. She – that was what she was intending in getting the relief for, for a [DVPO] against [Defendant]. As I'm sure this court knows, that [DVPO] gives [Plaintiff] more protection than a 50C.
>
> [Plaintiff was] in an intimate relationship with [Defendant]. However, when [Plaintiff] went to file for that [DVPO] and looked at the boxes that describe the allowable personal relationships, that – unfortunately, there was not a personal relationship box that fit her relationship with [Defendant] because they [we]re in a same-sex dating relationship and have never lived together.
>
> Because of that, [Plaintiff] did go ahead and proceed with filing that complaint for a [DVPO] and chose the box that was the closest that fit her relationship [with Defendant] and checked the opposite-sex dating partners.

Defendant consented to an amendment to the order to indicate her relationship with Plaintiff was one "of same sex currently or formerly in dating relationship."[2] The trial court questioned the necessity of amending the Form AOC-CV-306, which is the AOC form used by trial courts to grant or deny a petitioner's request for a DVPO—thereupon becoming the trial court's order. The trial court stated: "I do not have a complaint that . . . would survive a Rule 12 motion" because the plain language of N.C.G.S. § 50B-1(b)(6) limits relief to only those victims who suffer violence from dating or ex-dating partners that are of the "opposite sex." Plaintiff's attorney argued:

> [Plaintiff] should be allowed to proceed with the [DVPO], that . . . the statute, . . . 50B, is unconstitutional as it's written post the same-sex marriage equality case from the Supreme Court in *Obergefell* and that there's no rational basis at this point to have a statute that limits dating relationships to folks of opposite sex. So we would ask that Your Honor consider allowing [Plaintiff] to proceed with her [DVPO] case.

(Emphasis added). The trial court, by order entered 7 June 2018 (the "50B Order"), dismissed Plaintiff's complaint under Chapter 50B based upon a finding that Plaintiff had "failed to prove grounds for issuance of a" DVPO. On the 50B Order, the trial court checked Box 8, "Other," and wrote in the space included for Box 8:

> [P]laintiff has failed to state a claim upon which relief can be granted pursuant to the statute, due to the lack of statutorily defined personal relationship. A civil no-

---

[2] On the Form AOC-CV-306, the word "opposite" was stricken and the word "same" was written just above.

contact (50C) order was granted contemporaneously on the same allegations *and had the parties been of opposite genders, those facts would have supported the entry of a Domestic Violence Protective Order (50B).*

(Emphasis added). The trial court continued, noting:

N.C.G.S. 50B was last amended by the legislature in 2017 without amending the definition of "personal relationship" to include persons of the same sex who are in or have been in a dating relationship. This recent amendment in 2017 was made subsequent to the United States Supreme Court decision in *Obergefell v. Hodges*[] and yet the legislature did not amend the definition of personal relationship to include dating partners of the same sex.

(Emphasis added). The trial court also attached "Exhibit A"—a separate document titled "Order Denying Plaintiff's Motion for a DVPO," which the trial court "fully incorporated" into the 50B Order. Exhibit A states in relevant part:

2. [ ] Plaintiff, through her counsel, argued that she should be allowed to proceed on her request for a [DVPO] because the current North Carolina General Statute 50B-1(b) is unconstitutional after the United States Supreme Court decision in *Obergefell v. Hodges* and that there is no rational basis for denying protection to victims in same-sex dating relationships who are not spouses, ex-spouses, or current or former household members.

3. North Carolina General Statute 50B was passed by the North Carolina General Assembly in 1979 and later amended on several occasions. It states that an aggrieved party with whom they have a personal relationship may sue for a [DVPO] in order to prevent further acts of domestic violence. The question for the Court is how a personal relationship is defined. North Carolina General Statute 50B-1 states: "for purposes of this section, the term 'personal relationship' means wherein the parties involved:

(1) are current or former spouses; (2) are persons of opposite sex who live together or have lived together; (3) are related as parents and children, including others acting in loco parentis to a minor child, or as grandparents and grandchildren. For purposes of this subdivision, an aggrieved party may not obtain an order of protection against a child or grandchild under the age of 16; (4) have a child in common; (5) are current or former household members; (6) are persons of the opposite sex who are in a dating relationship or have been in a dating relationship."
. . . .

4. *This definition prohibits victims of domestic violence in same sex dating relationships that are not spouses, ex-spouses, or current of former household members from seeking relief against a batterer under Chapter 50B.*

5. *[This court] must consider whether it has jurisdiction to create a cause of action that does not exist and to enter an order under this statute when the statute specifically excludes it. The difficult answer to this question is no, it does not.* The General Assembly has the sole authority to pass legislation that allows for the existence of any domestic violence protective order. The legislature has not extended this cause of action to several other important family relationships including siblings, aunts, uncles, "step" relatives, or in-laws.

6. In this context, *the Courts only have subject matter jurisdiction* and *the authority to act* and enjoin a defendant *when the legislature allows it*. On numerous occasions the Court of Appeals has stricken orders entered by the District Court that do no[t] include proper findings of fact or conclusions of law that are necessary to meet the statute. [ ] Defendant must be on notice that a cause of action exists under this section when the act of domestic violence is committed. *[This court] cannot enter a [DVPO] against a [d]efendant when there is no statutory basis to do so.* . . . .

IT IS THEREFORE ORDERED, ADJUDGED, AND DECREED as follows:

1. [ ] Plaintiff has failed to prove grounds for issuance of a [DVPO] as Plaintiff *does not have a required "personal relationship" with [ ] Defendant as required by [Chapter] 50B.*

(Emphasis added).  Plaintiff appeals.

This Court granted motions to file *amicus curiae* briefs, in support of Plaintiff, from two separate groups consisting of non-profit organizations involved in domestic violence and LGBTQ+ issues: "North Carolina Coalition Against Domestic Violence" and "North Carolina LGBTQ+ Non-Profit Organizations."  Notably, the Attorney General of the State of North Carolina also filed a motion to brief the matter as an *amicus curiae*, which was granted.  This motion stated "the Attorney General, on behalf of the State, seeks to file a brief as *amicus curiae* in this case to vindicate the State's powerful interests in safeguarding all members of the public from domestic violence."  The State argued that its interest, including the "State's law-enforcement community," is in "ensuring that law enforcement has robust tools at its disposal to prevent and punish domestic violence" and "in ensuring that all its people are treated equally under the law"—particularly "where certain groups are being denied equal legal protections from private violence[,]" because "[t]he State and its law-enforcement community have an obligation to ensure the safety and security of all North Carolinians, without regard to their sexual orientation."  Defendant did not

file an appellee brief, and no *amici* sought to file briefs contesting Plaintiff's arguments on appeal. There were also no motions filed by any entity of the State to submit an *amicus* brief, or otherwise intervene in this action, for the purpose of arguing in favor of the constitutionality of the Act. Therefore, this Court, on its own motion and by order entered 3 May 2019, appointed an *amicus curiae* ("*Amicus*"), to brief an argument in response to Plaintiff's arguments on appeal.

## II. Plaintiff's Arguments on Appeal

Plaintiff argues that the trial court's denial of her request for a DVPO violated constitutional rights protected by the Due Process and Equal Protection Clauses of the Fourteenth Amendment, as well as the associated provisions of the North Carolina Constitution. *See* U.S. Const. amend. V; U.S. Const. amend. IX; U.S. Const. amend. XIV, § 1; N.C. Const. art. I, Declaration of Rights; N.C. Const. art. I, §§ 1, 2, 18, 19, 35, 36, 37. Therefore, as discussed below, our analysis is limited to a *de novo* review of whether Plaintiff was unconstitutionally denied a DVPO under N.C.G.S. § 50B-1(b)(6) *solely based on the fact that Plaintiff is a woman* and *Defendant is also a woman.* "Defendant's appeal raises questions of public policy as well as of law. We are concerned with the law, of course, but matters of public policy . . . cannot be disregarded in their interpretation." *State v. Harris*, 216 N.C. 746, 751, 6 S.E.2d 854, 858 (1940).

Plaintiff also states that her challenge to N.C.G.S. § 50B-1(b)(6) is an "as-applied" challenge, not a facial challenge. There is no dispute that, in general, *if* the "parties involved" in a "personal relationship" "[a]re persons of the opposite sex[,]" as defined by N.C.G.S. § 50B-1(b)(6), one of those "parties involved" may seek the protections of a DVPO against the other. Therefore, the application of N.C.G.S. § 50B-1(b)(6) does *not* violate the constitutional rights of "parties involved." N.C.G.S. § 50B-1(b)(6); *see also Town of Beech Mountain v. Genesis Wildlife Sanctuary, Inc.*, 247 N.C. App. 444, 460, 786 S.E.2d 335, 347 (2016), *aff'd*, 369 N.C. 722, 799 S.E.2d 611 (2017). There are important applications of N.C.G.S. § 50B-1(b)(6), such as protecting people in "opposite-sex" relationships from domestic violence through the issuance of DVPOs, that clearly do not violate the constitutional rights of those applicants; therefore, based upon the facts before us, Plaintiff's challenge to N.C.G.S. § 50B-1(b)(6) is as-applied. *Genesis Wildlife*, 247 N.C. App. at 460, 786 S.E.2d at 347 (citation omitted) ("'an as-applied challenge represents a plaintiff's protest against how a statute was applied in the particular context in which plaintiff acted or proposed to act, while a facial challenge represents a plaintiff's contention that a statute is incapable of constitutional application in any context'"); *see also Doe v. State*, 421 S.C. 490, 504, 808 S.E.2d 807, 814 (2017) (in which the Supreme Court of South Carolina found a statute similar to N.C.G.S. § 50B-1(b)(6) facially constitutional, but unconstitutional as applied to the petitioner).

Although Plaintiff is making an as-applied challenge to N.C.G.S. § 50B-1(b)(6) in this action, as in *Doe*, if we decide in favor of Plaintiff's as-applied challenge, our holdings will also prevent the unconstitutional denial of DVPOs to other persons "in similar same-sex relationships[.]" *Doe*, 421 S.C. at 509–10, 808 S.E.2d at 817 (citation omitted) ("[W]e declare sections [of the relevant statutes] unconstitutional as applied to Doe. Therefore, the family court may not utilize these statutory provisions to prevent Doe or those in similar same-sex relationships from seeking an Order of Protection."). In other words, if this Court decides that N.C.G.S. § 50B-1(b)(6) was unconstitutionally applied to Plaintiff in denying her request for a DVPO, based solely or in part on her gender or gender-identity, denial of the protections of Chapter 50B to any similarly situated plaintiff would also be prohibited as an unconstitutional application of the statute to that plaintiff.

We note that the trial court found as fact: "A civil no-contact (50C) order was granted contemporaneously *on the same allegations* [contained in Plaintiff's complaint and motion for a DVPO] and *had the parties been of opposite genders, those facts would have supported the entry of a Domestic Violence Protective Order (50B).*" (Emphasis added). This finding of fact is not challenged on appeal, and is therefore binding.[3] *Matter of M.C.*, 374 N.C. 882, __, 844 S.E.2d 564, 567 (2020).

---

[3] Had the trial court granted Plaintiff a Chapter 50B DVPO, that decision would be a matter of law that we would review *de novo*, but the unchallenged statement that the trial court *would have* granted the DVPO, had Plaintiff been a man, is a finding of fact that is conclusive on appeal.

### III. *N.C.G.S. § 50B-1*

The trial court concluded that "had [Plaintiff and Defendant] been of opposite genders, th[e] facts [found] would have supported the entry of a" DVPO, but it denied Plaintiff's request for a DVPO because the "definition [in N.C.G.S. § 50B-1(b)(6)] prohibits victims of domestic violence in same sex dating relationships that are not spouses, ex-spouses, or current or former household members from seeking relief against a batterer under Chapter 50B." Issuance of a DVPO pursuant to both N.C.G.S. §§ 50B-2 and 3 requires a proper allegation of "domestic violence" as defined by N.C.G.S. § 50B-1, which states in relevant part:

> (a) *Domestic violence means the commission of one or more of the following acts upon an aggrieved party* or upon a minor child residing with or in the custody of the aggrieved party *by a person with whom the aggrieved party has or has had a personal relationship*, but does not include acts of self-defense:
>
> > (1) *Attempting to cause bodily injury*, or intentionally causing bodily injury; *or*
> >
> > (2) *Placing the aggrieved party* or a member of the aggrieved party's family or household *in fear of imminent serious bodily injury or continued harassment*, as defined in G.S. 14-277.3A, that rises to such a level as to inflict substantial emotional distress[.]
>
> . . . .
>
> (b) For purposes of this section, *the term "personal relationship" means a relationship wherein the parties involved*:
>
> > (1) Are current or former spouses;

16

(2) Are persons of *opposite sex* who live together or have lived together;

(3) Are related as parents and children, including others acting in loco parentis to a minor child, or as grandparents and grandchildren. For purposes of this subdivision, an aggrieved party may not obtain an order of protection against a child or grandchild under the age of 16;

(4) Have a child in common;

(5) Are current or former household members;

(6) *Are persons of the <u>opposite sex</u> who are in a dating relationship or have been in a dating relationship.* . . . .

N.C.G.S. § 50B-1 (emphasis added).

The clear intent of this definition of "domestic violence" is to exclude victims of domestic violence from the protection of the Act if they and their abusive partners are of the same "sex"—though both men and women can seek the protections of a DVPO, so long as their alleged abusers are of the "opposite sex."  Although the Act has been amended multiple times, including after the United States Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644, 192 L. Ed. 2d 609 (2015), N.C.G.S. § 50B-1 has not been amended to retract the language limiting the protections of a DVPO in certain circumstances to persons in "opposite-sex" relationships.

IV.  Legal Background and Review

Plaintiff's arguments are challenges based upon the due process and equal protection clauses of both our state and federal constitutions.  Below, we will review

17

Plaintiff's challenge under the Constitution of North Carolina, then review Plaintiff's Fourteenth Amendment arguments.

In the recent opinions involving Fourteenth Amendment challenges to state action directed at people of "same-sex" status, the analyses of the United States Supreme Court have been based upon the Due Process Clause, the Equal Protection Clause, and a hybrid application of both—incorporating both the due process concept of fundamental "liberty" and equal protection "disparate treatment" review. The review in these cases does not appear to fit neatly within the traditional "rational basis," "intermediate scrutiny," or "strict scrutiny" review of challenges under the Fourteenth Amendment. We will hereafter refer to this "hybrid" review as "full Fourteenth Amendment" review.

In addition, the Supreme Court recently decided *Bostock v. Clayton County*, 590 U.S. __, 140 S. Ct. 1731, 207 L. Ed. 2d 218 (2020), in which Justice Gorsuch's majority opinion held, in a federal employment discrimination action, that when an employer takes discriminatory action against an employee based on the employee's "status" as gay, lesbian, or transgender, the employer is necessarily discriminating against the employee based upon that employee's "sex." *Id.* at __, 140 S. Ct. at 1746, 207 L. Ed. 2d at __. Although this opinion was not decided under the Fourteenth Amendment, we consider Justice Gorsuch's analysis in order to determine if the definitional holdings related to discrimination "based upon" "sex" should, or must, be

applied to Fourteenth Amendment challenges alleging discrimination based on LGBTQ+ status. If so, then allegations of discrimination based on the LGBTQ+ status of an individual are also allegations of discrimination based on the "sex" or "gender" of that person for Fourteenth Amendment purposes, and would require at least "intermediate scrutiny" review, as required in all actions alleging "sex" or "gender" discrimination.

In light of the ambiguity surrounding the appropriate test to apply in LGBTQ+ based Fourteenth Amendment cases, we will conduct alternative reviews—pursuant to due process, equal protection, and the full Fourteenth Amendment review we discern from the line of opinions culminating in *Obergefell*.

> "'[A]n alternative holding is not dicta but instead is binding precedent. *See, e.g., Massachusetts v. United States*, 333 U.S. 611, 623 (1948) (explaining that where a case has "been decided on either of two independent grounds" and "rested as much upon the one determination as the other," the "adjudication is effective for both")'"

*Evans v. Ga. Reg'l Hosp.*, 850 F.3d 1248, 1255–56 (11th Cir. 2017) (citations omitted)). We believe these alternative holdings under the state and federal constitutions are both appropriate and necessary because it is ultimately our Supreme Court that has the authority to definitively decide these issues under the Constitution of North Carolina, *State v. Berger*, 368 N.C. 633, 638–39, 781 S.E.2d 248, 252 (2016), and it is axiomatic that the United States Supreme Court is the ultimate arbiter of issues raised under the Constitution of the United States. Further, the Supreme Court has

regularly rendered opinions basing its holdings finding Fourteenth Amendment violations on *both* the Due Process Clause *and* the Equal Protection Clause.

### A. *North Carolina Constitution*

### 1. General Principles

The immutable fact when deciding a statutory challenge under the North Carolina Constitution is: "[W]e cannot construe the provisions of the North Carolina Constitution to accord the citizens of North Carolina any lesser rights than those which they are guaranteed by parallel federal provisions in the federal Constitution." *Libertarian Party of N. C. v. State*, 200 N.C. App. 323, 332, 688 S.E.2d 700, 707 (2009) (citation omitted), *aff'd as modified*, 365 N.C. 41, 707 S.E.2d 199 (2011). However, while "the United States Constitution provides a constitutional floor of fundamental rights guaranteed all citizens of the United States, [] the state constitutions frequently give citizens of individual states basic rights in addition to those guaranteed by the United States Constitution." *State v. Jackson*, 348 N.C. 644, 648, 503 S.E.2d 101, 103 (1998).

The sections of the North Carolina Constitution relevant to this case are found in Article I:

> Article I, Section 1 establishes that all persons are afforded the "inalienable rights [of] . . . life, liberty, the enjoyment of the fruits of their own labor, and the pursuit of happiness." N.C. Const. art. I, § 1. Article I, Section 19 provides, "[n]o person shall be . . . deprived of his life, liberty, or property, but by the law of the land." N.C. Const.

art. I, § 19. "The law of the land, like due process of law, serves to limit the state's police power to actions which have a real or substantial relation to the public health, morals, order, safety or general welfare."

*Hope – A Women's Cancer Ctr., P.A. v. State*, 203 N.C. App. 593, 602–03, 693 S.E.2d 673, 680 (2010) (citation omitted); *see also State v. Ballance*, 229 N.C. 764, 769, 51 S.E.2d 731, 734 (1949) (citations omitted) ("The term 'law of the land' is synonymous with 'due process of law,' a phrase appearing in the Federal Constitution and the organic law of many states."). The protections of the "law of the land" or "due process," requirements are "'intended to secure the individual from the arbitrary exercise of the powers of government, unrestrained by the established principles of private rights and distributive justice.'" *Gunter v. Town of Sanford*, 186 N.C. 452, 456, 120 S.E. 41, 43 (1923) (citations omitted).

These fundamental guaranties are very broad in scope, and are intended to secure to each person subject to the jurisdiction of the State extensive individual rights, including that of personal liberty. The term "liberty," as used in these constitutional provisions, does not consist simply of the right to be free from arbitrary physical restraint or servitude, but is "deemed to embrace the right of man to be free in the enjoyment of the faculties with which he has been endowed by his Creator, subject only to such restraints as are necessary for the common welfare. . . . It includes the right of the citizen to be free to use his faculties in all lawful ways[.]"

. . . .

An exertion of the police power inevitably results in a limitation of personal liberty, and legislation in this field

21

"is justified only on the theory that the social interest is paramount." In exercising this power, the legislature must have in view the good of the citizens as a whole rather than the interests of a particular class.

*Ballance*, 229 N.C. at 769, 51 S.E.2d at 734-35 (citations omitted).

Concerning the equal protection clause of section 19:

[Our Supreme] Court has said that the principle of the equal protection of the law, made explicit in the Fourteenth Amendment to the Constitution of the United States, was also inherent in the Constitution of this State even prior to the revision thereof at the General Election of 1970. . . . .

. . . .

[Even when "]the law itself be fair on its face, and impartial in appearance, yet, if it is applied and administered by public authority with . . . an unequal hand, so as practically to make unjust and illegal discriminations between persons in similar circumstances, material to their rights, the denial of equal justice is still within the prohibition of the constitution."

*S.S. Kresge Co. v. Davis*, 277 N.C. 654, 660–61, 178 S.E.2d 382, 385–86 (1971) (emphasis added) (citations omitted).

It is a fundamental obligation of the courts of this state to protect the people from unconstitutional laws, as well as the unconstitutional *application* of the laws. *Id.* at 660–61, 178 S.E.2d at 385–86 (emphasis added) (citations omitted) (the "constitutional protection against unreasonable discrimination under color of law" "*extends also to the administration and the execution of laws* valid on their face"). Article I is construed liberally in this regard:

22

In *Trustees of the University of North Carolina v. Foy*, 5 N.C. 57 (1805), the Court recognized the supremacy of rights protected in Article I [of the North Carolina Constitution] and indicated that it would only apply the rules of decision derived from the common law and such acts of the legislature that are consistent with the Constitution. . . . .

It is the state judiciary that has the responsibility to protect the state constitutional rights of the citizens; this obligation to protect the fundamental rights of individuals is as old as the State. Our Constitution is more detailed and specific than the federal Constitution in the protection of the rights of its citizens. . . . . *We give our Constitution a liberal interpretation in favor of its citizens with respect to those provisions which were designed to safeguard the liberty and security of the citizens in regard to* both *person* and property.

*Corum v. Univ. of N.C. Through Bd. of Governors*, 330 N.C. 761, 783, 413 S.E.2d 276, 290 (1992) (emphasis added) (citations omitted).

The police powers of the State, though broad, are limited by constitutional guarantees.

"In order that a statute or ordinance may be sustained as an exercise of the police power, the courts must be able to see that the enactment *has for its object the prevention of some offence or manifest evil*, or the *preservation of the public health, safety*, morals, *or general welfare*, and that there is some *clear, real, and substantial connection between the assumed purpose of the enactment and the actual provisions thereof*, and that *the latter do, in some plain, appreciable, and appropriate manner, tend towards the accomplishment of the object* for which the power is exercised."

*State v. Williams*, 146 N.C. 618, 627, 61 S.E. 61, 64 (1908) (emphasis added) (citations omitted).

When no fundamental rights or protected classes of people are involved, the courts apply the following test:

> *If a statute is to be sustained* as a legitimate exercise of the police power, it must have a rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare. In brief, *it must be reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of a public harm.*

*Ballance*, 229 N.C. at 769–70, 51 S.E.2d at 735 (emphasis added) (citations omitted).

Certain restrictions on constitutional rights, such as ones based on "sex" or gender, require "intermediate scrutiny": "Articulations of intermediate scrutiny vary depending on context, but tend to require an important or substantial government interest, a direct relationship between the regulation and the interest, and regulation no more restrictive than necessary to achieve that interest." *State v. Packingham*, 368 N.C. 380, 387, 777 S.E.2d 738, 745 (2015) (citation omitted), *rev'd on other grounds*, *North Carolina v. Packingham*, ___ U.S. ___, 198 L. Ed. 2d 273 (2017). However: "'[A] law which burdens certain explicit or implied fundamental rights must be strictly scrutinized. It may be justified only by a compelling state interest, and must be narrowly drawn to express only the legitimate interests at stake.'" *Libertarian Party*, 200 N.C. App. at 332, 688 S.E.2d at 707 (citation omitted).

As our Supreme Court has recognized, the "liberty" protected by our constitution includes the right to live as one chooses, within the law,[4] unmolested by unnecessary State intrusion into one's privacy, or attacks upon one's dignity. *Tully v. City of Wilmington*, 370 N.C. 527, 534, 810 S.E.2d 208, 214 (2018) (citation omitted) ("The basic constitutional principle of personal liberty and freedom embraces the right of the individual to be free to enjoy the faculties with which he has been endowed[.]  This precept emphasizes the dignity, integrity and liberty of the individual, the primary concern of our democracy.").

### 2. Application to Plaintiff's Appeal

After *Obergefell*, and other precedent of the Supreme Court, there is no longer any doubt that *any* two consenting adults have a fundamental right to marry each other—absent fraud impacting a legitimate government interest.  As far as romantic relationships are concerned, any member of the LGBTQ+ community has the same rights and freedoms to make personal decisions about dating, intimacy, and marriage as any non-LGBTQ+ individual.  Therefore, there can be *no* State interest in interfering with Plaintiff's liberty to date whomever she wants to date, or to interfere with Plaintiff's private and intimate choices related to dating another consenting adult.  Under the North Carolina Constitution, Plaintiff is similarly situated with every other adult in this regard.

---

[4] Meaning valid, constitutional laws.

The minimum level of review for Plaintiff's state constitutional challenges is that required by the Constitution of the United States, which we hold below is at least intermediate scrutiny. Therefore, N.C.G.S. § 50B-1(b)(6) can only survive Plaintiff's as-applied challenge if the State proves, at a minimum, (1) that the statute protects an "important or substantial government interest,", (2) that the statute's requirements have a "direct relationship between the regulation and the interest [the State seeks to protect]," and (3) that the "regulation [is] no more restrictive than necessary to achieve that interest." *Hest Techs., Inc. v. State ex rel. Perdue*, 366 N.C. 289, 298, 749 S.E.2d 429, 436 (2012) (citation omitted). The State cannot meet its burden in this case.

"'The best indicia of [legislative] intent are the language of the statute or ordinance, the spirit of the act and what the act seeks to accomplish.'" *State v. Byrd*, 185 N.C. App. 597, 603, 649 S.E.2d 444, 449 (2007) (citation omitted), *rev'd on other grounds*, 363 N.C. 214, 675 S.E.2d 323 (2009). "It is without question that the language of the statute, the spirit of Section 50B, and what [it] seeks to accomplish is to protect individuals from domestic violence through, inter alia, the imposition of an enhanced sentencing to serve as a deterrent against those who perpetrate the violence." *Id.* We can conceive of no scenario in which denying the protections of a DVPO to victims of domestic violence perpetrated by a same-sex partner furthers the "intent" of Chapter 50B, nor "what [it] seeks to accomplish"—reduction in domestic

violence. *Id.* The requirement in N.C.G.S. § 50B-1(b)(6) that Plaintiff's complaint for a DVPO be denied solely based upon the "same-sex" nature of her relationship serves no government interest, much less any "important or substantial government interest." *Hest Techs.*, 366 N.C. at 298, 749 S.E.2d at 436. As applied to Plaintiff, the "regulation" involved, N.C.G.S. § 50B-1(b)(6), is in direct conflict with the purposes of the Act. Also, the "regulation," along with serving *no* "important," "substantial," or even legitimate government interest, is highly restrictive—it constitutes a *total and complete ban* on Plaintiff, and those similarly situated, obtaining DVPO protections against those who desire to do them harm. There is no question but that, as applied to Plaintiff, N.C.G.S. § 50B-1(b)(6) fails strict scrutiny, and violates both the due process clause—substantive and procedural, and the equal protection clause, of art. I, § 19, and the State, in its *amicus* brief, does not make any such argument—it argues the Act was unconstitutional as applied to Plaintiff and those similarly situated.

Even had the State desired to make such an argument, N.C.G.S. § 50B-1(b)(6) cannot survive even the lowest level of scrutiny. Absent any legitimate State interest, the statute is not "a legitimate exercise of the police power"; there is no "rational, real, or substantial relation to the public health, morals, order, or safety, or the general welfare"; and there is no scenario where it could be considered "reasonably necessary to promote the accomplishment of a public good, or to prevent the infliction of a public harm." *Ballance*, 229 N.C. at 769–70, 51 S.E.2d at 735 (citations omitted). Instead,

27

N.C.G.S. § 50B-1(b)(6), by denying Plaintiff and similarly situated people the protections it provides victims of domestic violence in "opposite-sex" dating relationships, runs directly counter to the promotion of the public good, welfare, morals, safety, and any other legitimate public interests of the State.

We hold, pursuant to the North Carolina Constitution, that N.C.G.S. § 50B-1(b)(6) is unconstitutional as-applied to Plaintiff and those similarly situated. *See Dunn v. Pate*, 334 N.C. 115, 123, 431 S.E.2d 178, 183 (1993) ("Plaintiffs have offered no argument as to what significant governmental interests, if any, were served by this gender-based distinction . . . and we will not speculate as to what those interests may have been. Since the . . . statutes at issue required unequal application of the law while serving no clearly discernable important governmental interest, they were unconstitutional . . . and will not [] be enforced by this Court.").

B. *The Fourteenth Amendment*

1. Text and Purpose

The first clause, the Privileges and Immunities Clause, prohibits differential treatment of any citizen of the United States based upon their present or former *state* citizenship. It also lays the foundational principle upon which the Due Process Clause and the Equal Protection Clause are premised—United States citizenship stands as a guarantee against the abridgement, by state action, of certain "privileges and immunities" that are fundamental rights of every United States citizen. *Id.*

It is the duty of this Court, like every court, to ensure the "privileges and immunities" referenced in the Fourteenth Amendment—which include the guarantee that all individual rights recognized in the Bill of Rights, as well as all other "fundamental rights" recognized as such in the Constitution and common law—are available to every citizen of our nation, and that all such persons, regardless of any other "statuses" that might be applied to them, receive equal privilege and protection under the law as those similarly situated.

The Supreme Court's recent decisions involving laws discriminating against "same-sex" individuals rely, in part, on the dissent from the *Civil Rights* Cases, decided shortly after ratification of the Fourteenth Amendment. The dissenting opinion recognized that the particular "status" of an individual, or "classifications" of particular groups of people to which an individual may be deemed a member, were generally irrelevant when considering the individual's rights under the Fourteenth Amendment, and whether any of these rights had been violated. *Civil Rights Cases,* 109 U.S. 3, 29–30, 27 L. Ed. 835, 845 (1883) (Harlan, J., dissenting). The *only* status generally relevant to an individual's right to the full panoply of privileges, immunities, and protections guaranteed by the Constitution is that of *citizen*.[5]

2. Due Process

---

[5] When a citizen is similarly situated to others to whom a particular law applies.

"[T]he Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary exercise of the powers of government[,]" *Daniels v. Williams*, 474 U.S. 327, 331, 88 L. Ed. 2d 662, 668 (1986) (citations and quotation marks omitted), and it "furnishes a guaranty against *any* encroachment by the State on the fundamental rights belonging to *every* citizen." *Sale v. State Highway & Pub. Works Comm'n*, 242 N.C. 612, 617, 89 S.E.2d 290, 295 (1955) (emphasis added) (citation omitted). Of course, the State can pass and enforce laws that impact the fundamental rights of certain groups of people, when done constitutionally:

> The police power of the State extends to all the compelling needs of the public health, safety, morals and general welfare. Likewise, the liberty protected by the Due Process . . . Clause[] of the Federal . . . Constitution[] extends to all fundamental rights of the individual. It is the function of the courts to establish the location of the dividing line between the two by the process of locating many separate points on either side of the line.

*State v. Dobbins*, 277 N.C. 484, 497, 178 S.E.2d 449, 457 (1971).

There are two interests protected by the Due Process Clause:

> Due process has come to provide two types of protection for individuals against improper governmental action, substantive and procedural due process. *State v. Thompson*, 349 N.C. 483, 491, 508 S.E.2d 277, 282 (1998). Substantive due process ensures that the government does not engage in conduct that "shocks the conscience," *Rochin v. California*, 342 U.S. 165, 172 (1952), or hinder rights "implicit in the concept of ordered liberty," *Palko v. Connecticut*, 302 U.S. 319, 325 (1937). In the event that

30

> the legislation in question meets the requirements of substantive due process, procedural due process "ensures that when government action deprive[s] a person of life, liberty, or property . . . that action is implemented in a fair manner." *Thompson,* 349 N.C. at 491, 508 S.E.2d at 282.

*State v. Bryant*, 359 N.C. 554, 563–64, 614 S.E.2d 479, 485 (2005) (citations omitted). Certain violations of substantive due process are so substantial that no procedure is sufficient to remedy the violation and, therefore, procedural due process analysis is not required to find the state action in question unconstitutional. Lesser violations of substantive due process require procedural due process analysis to determine whether the interests of the state advanced by its action, along with the procedural safeguards included in the state action, are sufficient to survive due process analysis. As recognized by our Supreme Court:

> That there is a limit to the police power which the courts must, when called upon in a judicial proceeding, ascertain and declare is as well settled as the existence of the power itself. . . . . "It does not at all follow that every statute enacted ostensibly for the promotion of [the public good] is to be accepted as a legitimate exercise of the police power of the state. There are, of necessity, limits beyond which legislation cannot rightfully go. . . . . If, therefore, *a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to these objects, or is a palpable invasion of rights secured by the fundamental law, it is the duty of the courts so to adjudge and thereby give effect to the Constitution.*"

*Williams*, 146 N.C. at 627, 61 S.E. at 64 (emphasis added) (citations omitted). We review substantive and procedural due process in turn.

31

### a. Substantive Due Process

"'It is a promise of the Constitution that there is a realm of personal liberty which the government may not enter.'" *Lawrence v. Texas*, 539 U.S. 558, 578, 156 L. Ed. 2d 508, 526 (2003) (citation omitted). The Due Process Clause "furnishes a guaranty against any encroachment by the State on the *fundamental rights* belonging to *every* citizen." *Sale*, 242 N.C. at 617, 89 S.E.2d at 295 (emphasis added) (citation omitted). When state action is alleged to abridge recognized personal rights fundamental to every individual, or when it is alleged to intrude upon constitutionally recognized liberty interests by targeting certain "categories" or "classes" of individuals, substantive due process review is required. If state action unduly encroaches on "fundamental personal rights," whether of an individual or a "class" of people, then strict scrutiny review applies. *Clayton v. Branson*, 170 N.C. App. 438, 455, 613 S.E.2d 259, 271 (2005) (citations omitted); *Lawrence*, 539 U.S. at 577–79, 156 L. Ed. 2d at 525–26 (substantive due process prohibits state proscription of the liberty rights of members of a particular group—a "suspect class"—based on animus or historical acceptance of discrimination against the class). Under strict scrutiny review, "'*the party seeking to apply the law* must demonstrate that it serves *a compelling state interest*.'" *State v. Fowler*, 197 N.C. App. 1, 21, 676 S.E.2d 523, 540–41 (2009) (emphasis added) (citation omitted); *Clayton*, 170 N.C. App. at 455, 613 S.E.2d at 271.

However, "'[i]f the right infringed upon is not fundamental in the constitutional sense, the party seeking to apply it need only meet the traditional test of establishing that *the law is rationally related to a legitimate state interest*.'" *Fowler*, 197 N.C. App. at 21, 676 S.E.2d at 540–41 (emphasis added) (citation omitted); *Clayton*, 170 N.C. App. at 455, 613 S.E.2d at 271 (citations and quotation marks omitted) (explaining that, "[u]nless legislation involves a suspect classification or impinges upon fundamental personal rights, . . . the mere rationality standard applies and the law in question will be upheld if it has any conceivable rational basis").

When fundamental rights are abridged by state action, the state's interest must be weighed against the intrusion into those rights—factoring the nature of the fundamental right as well as the extent of the "intrusion." *See, e.g., Dobbins*, 277 N.C. at 499, 178 S.E.2d at 457–58 ("the right to travel on the public streets is a fundamental segment of liberty and, of course, the absolute prohibition of such travel requires substantially more justification than the regulation of it by traffic lights and rules of the road"); *Lawrence*, 539 U.S. at 574, 156 L. Ed. 2d at 523 (citing *Romer v. Evans*, 517 U.S. 620, 624, 634, 134 L. Ed. 2d 855, 861(2003)) ("*Romer* invalidated an amendment to Colorado's Constitution which named as a solitary class persons who were homosexuals, lesbians, or bisexual either by 'orientation, conduct, practices or relationships,' and deprived them of protection under state antidiscrimination laws. We concluded that the provision was 'born of animosity toward the class of persons

33

affected' and further that it had no rational relation to a legitimate governmental purpose." (citing *Romer v. Evans*, 517 U.S. 620, 624, 634, 134 L. Ed. 2d 855, 861(2003))). Pursuant to precedent set by the Supreme Court, substantive due process prohibits state proscription of the liberty rights of members of a particular group—a suspect class—when it is based on animus towards the class, or historical acceptance of discrimination against the class. *Lawrence*, 539 U.S. at 575–79, 156 L. Ed. 2d at 523–26 ("When homosexual conduct is made criminal by the law of the State, that declaration in and of itself is an invitation to subject homosexual persons to discrimination both in the public and in the private spheres.").

Substantive due process therefore prohibits a state from arbitrarily deciding which "classes" of people may enjoy the constitutional protections of recognized fundamental rights and which "classes" may be excluded. For example:

> [In *United States v. Windsor*, 570 U.S. 744, 186 L. Ed. 2d 808 (2013), the Supreme Court's] concern sprung from [the] creation of two classes of married couples within states that had legalized same-sex marriage: opposite-sex couples, whose marriages the federal government recognized, and same-sex couples, whose marriages the federal government ignored. The resulting injury to same-sex couples served as the foundation for the Court's conclusion that [the Defense of Marriage Act] violated the Fifth Amendment's Due Process Clause."

*Bostic v. Schaefer*, 760 F.3d 352, 378 (4th Cir. 2014). This Court, like the Supreme Court in *Lawrence*, 539 U.S. at 574, 156 L. Ed. 2d at 523, considers the Court's equal

protection analysis in *Romer* in our substantive due process analysis. The Court in

*Romer* noted:

> [The challenged law] identifies persons by a single trait
> and then denies them protection across the board. The
> resulting disqualification of a class of persons from the
> right to seek specific protection from the law is
> unprecedented in our jurisprudence. The absence of
> precedent for [the law] is itself instructive;
> '[d]iscriminations of an unusual character especially
> suggest careful consideration to determine whether they
> are obnoxious to the constitutional provision.'"

*Romer*, 517 U.S. at 633, 134 L. Ed. 2d at 866 (citation omitted).

### b. *Procedural Due Process*

"Procedural due process imposes constraints on governmental decisions which

deprive individuals of 'liberty' . . . interests within the meaning of the Due Process

Clause of the Fifth or Fourteenth Amendment." *Mathews v. Eldridge*, 424 U.S. 319,

332, 47 L. Ed. 2d 18, 31 (1976). "The fundamental requirement of due process is the

opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Id.* at

333, 47 L. Ed. 2d at 32 (citation omitted).

> "'[D]ue process,' unlike some legal rules, is not a technical
> conception with a fixed content unrelated to time, place
> and circumstances." "[D]ue process is flexible and calls for
> such procedural protections as the particular situation
> demands." Accordingly, resolution of the issue whether the
> administrative procedures provided here are
> constitutionally sufficient requires analysis of the
> governmental and private interests that are affected. More
> precisely, our prior decisions indicate that identification of
> the specific dictates of due process generally requires

consideration of three distinct factors: first, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 334–35, 47 L. Ed. 2d at 33 (citations omitted).

### c. Application to Plaintiff's Appeal

We first determine whether, by denying Plaintiff a DVPO based upon the nature of the relationship she had with the Defendant, any fundamental rights of Plaintiff's were abridged. Plaintiff, like everyone, enjoys a fundamental right to personal safety:

The liberty preserved from deprivation without due process include[s] the right "generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." Among the historic liberties so protected was a right to be *free from*, and to *obtain judicial relief for,* unjustified *intrusions on personal security*.

*Ingraham v. Wright*, 430 U.S. 651, 673, 51 L. Ed. 2d 711, 731 (1977) (emphasis added) (citations omitted). "The State may not, of course, *selectively deny its protective services to certain disfavored minorities* without violating the Equal Protection Clause." *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 197 n.3, 103 L. Ed. 2d 249, 259 n.3 (1989) (emphasis added) (citation omitted); *see also Kennedy v.*

*City of Ridgefield*, 439 F.3d 1055, 1061 (9th Cir. 2006) ("It is well established that the Constitution protects a citizen's liberty interest in her own bodily security. It is also well established that, although the state's failure to protect an individual against private violence does not generally violate the guarantee of due process, it can where the state action 'affirmatively place[s] the plaintiff in a position of danger,' that is, where state action creates or exposes an individual to a danger which he or she would not have otherwise faced." (citations omitted)).

Plaintiff had the same constitutional right under the Fourteenth Amendment to seek love or companionship with another woman as she would have had to seek such a relationship with a man. Her liberty rights were identical to those of any other woman seeking a dating relationship with a man. Plaintiff's constitutional rights to liberty, privacy, and intimacy in her relationship with Defendant were identical in every way to those of any other woman in an "opposite sex" relationship. Plaintiff would have had the fundamental right to marry Defendant; just as she had the fundamental liberty right to decide to end her relationship with Defendant. However, pursuant to N.C.G.S. § 50B-1(b)(6), Plaintiff, and those similarly situated, are intentionally denied, *by the State*, the same protections against the domestic violence that may occur after a "break-up," or for any other "reason" one person decides to intentionally injure another.

The State, through its legislation, has subjected Plaintiff to a heightened potential of harassment, or physical abuse, by denying her the more stringent and immediately accessible remedies and protections provided to "opposite sex" victims of domestic violence in situations similar to hers.[6] By its plain language, N.C.G.S. § 50B-1(b)(6) creates a class of persons *singled out* for exposure to a heightened risk of "fear of imminent serious bodily injury or continued harassment," as well as "intentionally caus[ed] bodily injury." N.C.G.S. §§ 50B-1(a)(1)-(2).

The class of excluded, or potentially excluded, persons is that class of people who are identified as members of the LGBTQ+ community, whether by self-identification or by statutory definition. The factors most commonly used in identifying members of the LGBTQ+ class are sexual orientation and gender identity—though we do not mean to suggest these two classifications, which are themselves made up of people whose "sexual" and "gender" "identities" express great diversity, are meant to approach a full definition of the LGBTQ+ "class," or its "members." However, because the courts are required to classify people based upon the plain language of the statute, the Act requires the courts to intrude into the private lives of petitioners in order to know whether it must tell an abused person that Chapter 50B protections cannot be provided—because the State has determined

---

[6] We again note that the State, through the executive branch, argues in favor of Plaintiff, and a ruling requiring all persons, including those in the LGBTQ+ community, equal access to the full protections offered in Chapter 50B. However, only the General Assembly can amend the statutes.

they are not entitled to the same protections granted to similarly situated "opposite-sex" petitioners. A judicial inquiry and experience that may be, for many, an unwanted intrusion into their private lives that could lead to harmful consequences. N.C.G.S. § 50B-1(b)(6) imposes a *statutory requirement* that the trial court conduct this invasive inquiry, and the inquiry itself can result in emotional and psychological harm to the petitioners—and under the Act the outcome must always result in denial of the requested DVPO.

In this case, based on her allegations, Plaintiff, after having been physically assaulted, having been accosted on her property, having had the sanctity of her home invaded, and having been harassed, was seeking protections the State affords solely to a single class of people—one comprised of those whose personal identity includes romantic attraction to people of the opposite sex.[7] Further, Plaintiff could have obtained a DVPO if she and Defendant had cohabitated, if they were married, or had joint custody of a child.

Plaintiff's right of personal security, like everyone's, is fundamental, yet the State has denied her protective services it affords others based entirely on her LGBTQ+ status. It is solely this status that led the trial court to believe it lacked the jurisdiction to grant Plaintiff a DVPO. The Act's denial of Plaintiff's right to security

---

[7] And whose requests for protection under the act are based on alleged injury resulting from an "opposite sex" "dating relationship."

placed her in a position that "expose[d] [her] to a danger which . . . she would not have otherwise faced." *Kennedy*, 439 F.3d at 1061 (citation omitted).

The Supreme Court has also recognized a general fundamental liberty right to personal "autonomy," "identity," and "dignity": "The fundamental liberties protected by [the Due Process] Clause include most of the rights enumerated in the Bill of Rights. In addition, these liberties extend to certain personal choices central to individual dignity and autonomy, including intimate choices that define personal identity and beliefs." *Obergefell*, 576 U.S. at 663, 192 L. Ed. 2d at 623 (citations omitted). The Supreme Court recognizes that some of the most important and fundamental choices involving protected "liberties" are those involving personal and intimate unions with others. *Id.* at 665–66, 192 L. Ed. 2d at 624. Though these choices may lead to marriage, it is not necessary that they reach that point before they become constitutionally fundamental. *Id.* (emphasis added) (citation omitted) ("Like choices concerning contraception, family relationships, procreation, and childrearing, *all of which are protected by the Constitution*, decisions concerning marriage are among the most intimate that an individual can make."). The Court has stated:

> In explaining the respect the Constitution demands for the autonomy of the person in making these [very personal] choices, we stated as follows:
>
>> "These matters, involving the most intimate and personal choices a person may make in a lifetime,

> choices central to personal dignity and autonomy, are *central to the liberty protected by the Fourteenth Amendment.* At the *heart of liberty* is the *right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State.*"
>
> Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do.

*Lawrence*, 539 U.S. at 574, 156 L. Ed. 2d at 523 (emphasis added) (citation omitted).

Plaintiff has a right to the liberty to pursue her "own concept of existence" and the other "myster[ies] of human life" with the same autonomy, dignity and security as any other person in her situation. This pursuit will undeniably be impacted by the choices she makes regarding romantic or intimate partners. This right, "central to personal dignity and autonomy," is fundamental, and should not be interfered with by the State. By telling Plaintiff that her existence is not as valuable as that of individuals who engage in "opposite-sex" relationships, the State is not just needlessly endangering Plaintiff, it is expressing State-sanctioned animus toward her. Adopting the reasoning and analysis of the Court in *Windsor*, we hold:

> [T]hough [the General Assembly] has great authority to design laws to fit its own conception of sound . . . policy, it cannot deny the liberty protected by the Due Process Clause[.]
>
> What has been explained to this point should more than suffice to establish that the principal purpose and the necessary effect of [N.C.G.S. § 50B-1(b)(6) is] to demean

41

those persons who are in a lawful [dating relationship that turns violent].  This requires the Court to hold, as it now does, that [N.C.G.S. § 50B-1(b)(6), as applied,] is unconstitutional as a deprivation of the liberty of the person protected by the [Fourteenth] Amendment of the Constitution.

*Windsor*, 570 U.S. at 774, 186 L. Ed. 2d at 829–30.

### 3.  Equal Protection

#### a.  *General Principles*

"The Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 87 L. Ed. 2d 313, 320 (1985) (citation omitted).

> The Fourteenth Amendment's promise that no person shall be denied the equal protection of the laws must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons.  We have attempted to reconcile the principle with the reality by stating that, *if* a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end.

*Romer*, 517 U.S. at 631, 134 L. Ed. 2d at 865 (emphasis added) (citations omitted). Further, the State must respect "the principle that government and each of its parts remain open on impartial terms to all who seek its assistance:

> "'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.'" Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'"

*Romer*, 517 U.S. at 633–34, 134 L. Ed. 2d at 866–67 (citations omitted).

At a minimum, the state cannot make a statutory classification of people in order "to make them unequal to everyone else. . . . . A State cannot so deem a class of persons a stranger to its laws." *Romer*, 517 U.S. at 635, 134 L. Ed. 2d at 868. "'[A] classification cannot be made arbitrarily[.]' . . . . '[A]rbitrary selection can never be justified by calling it classification.'" *McLaughlin v. Florida*, 379 U.S. 184, 190, 13 L. Ed. 2d 222, 227 (1964) (citations omitted). Finally, "[j]udicial inquiry under the Equal Protection Clause . . . does not end with a showing of equal application among the members of the class defined by the legislation. The courts must reach and determine the question whether the classifications drawn in a statute are reasonable in light of its purpose[.]" *Id.* at 191, 13 L. Ed. 2d at 228.

Pursuant to the generally applied approach:

> Our analysis of the Opponents' Fourteenth Amendment claims has two components. First, we ascertain what level of constitutional scrutiny applies: either rational basis review or some form of heightened scrutiny, such as strict scrutiny. Second, we apply the appropriate level of

43

scrutiny to determine whether the ... [l]aws pass constitutional muster.

Under both the Due Process and Equal Protection Clauses, interference with a fundamental right warrants the application of strict scrutiny. *Glucksberg*, 521 U.S. 702, 719–20; *Zablocki*, 434 U.S. 374, 383. We therefore begin by assessing whether the ... [l]aws infringe on a fundamental right. Fundamental rights spring from the Fourteenth Amendment's protection of individual liberty, which the Supreme Court has described as "the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life." *Casey*, 505 U.S. 833, 851.

*Bostic*, 760 F.3d at 375 (citations omitted). Strict scrutiny also applies "when a regulation classifies persons on the basis of certain designated suspect characteristics[.]" *Dep't of Transp. v. Rowe*, 353 N.C. 671, 675, 549 S.E.2d 203, 207 (2001) (*citing San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 16–17, 36 L. Ed. 2d 16, 33 (1973); *Texfi Indus., Inc. v. City of Fayetteville*, 301 N.C. 1, 11, 269 S.E.2d 142, 149 (1980)).

If a regulation receives strict scrutiny, then the state must prove that the classification is necessary to advance a compelling government interest; otherwise, the statute is invalid. *San Antonio*, 411 U.S. at 16–17. Other classifications, including gender and illegitimacy, trigger intermediate scrutiny, which requires the state to prove that the regulation is substantially related to an important government interest. *Clark v. Jeter*, 486 U.S. 456471 (1988); *Craig v. Boren*, 429 U.S. 190407 (1976). If a regulation draws any other classification, it receives only rational-basis scrutiny, and the party challenging the regulation must show that it bears no rational relationship to any legitimate government interest. If the party cannot

so prove, the regulation is valid. *Nordlinger v. Hahn*, 505
U.S. 1, 10 (1992); *Texfi*, 301 N.C. at 11.

*Rowe*, 353 N.C. at 675, 549 S.E.2d at 207 (citations omitted).

### b. *Application to Plaintiff's Appeal*

The *core* of the Equal Protection Clause is the principle that "all persons similarly circumstanced shall be treated alike." *Louisville Gas & Elec. Co. v. Coleman*, 277 U.S. 32, 37, 72 L. Ed. 770, 774 (1928) (citations and quotation marks omitted). As noted, "generally [ ] the equal protection clause means that the rights of all persons must rest upon the same rule under similar circumstances, and that it applies to the exercise of all the powers of the state which can affect the individual[.]" *Id.* "[C]lassifications affecting fundamental rights are given the most exacting scrutiny." *Clark*, 486 U.S. at 461, 100 L. Ed. 2d at 471 (citations omitted). We have held above that Plaintiff has a fundamental right to liberty, which includes the right to personal security, dignity and "'the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life.' *Casey*, 505 U.S. 833, 851." *Bostic*, 760 F.3d at 375 (citation omitted). Therefore, we hold Plaintiff's as-applied challenge to the Act must be reviewed under strict scrutiny.

The *only* thing preventing Plaintiff from being similarly situated to an "opposite-sex" person in a former "dating relationship" is *the statute* itself—N.C.G.S. § 50B-1(b)(6). Plaintiff's LGBTQ+ status is a "mere difference" between her and a woman in an "opposite-sex" "dating relationship," and this status "is not enough" to

justify the injury the State is perpetrating on Plaintiff. *Coleman*, 277 U.S. at 37, 72 L. Ed. at 774 (citations omitted). The statute only serves to promote both the frequency and severity of domestic violence, in a targeted group that is, pursuant to the Constitution of the United States, in no legally cognizable or relevant manner different from the group identified by N.C.G.S. § 50B-1 as persons who are, or have been, in a "dating relationship" with a person of the "opposite-sex" and, therefore, permitted the protections of a DVPO by N.C.G.S. § 50B-1(b)(6). The "opposite-sex" distinction limiting the protections of N.C.G.S. § 50B-1(b)(6) was "made arbitrarily," and so remains, and N.C.G.S. § 50B-1(b)(6) bears no "reasonable" nor "just relation to [Chapter 50B] in respect to which the classification is proposed[.]" *Coleman*, 277 U.S. at 37, 72 L. Ed. at 774 (citations and quotation marks omitted). N.C.G.S. § 50B-1(b)(6) "is a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests; it is a classification of persons undertaken for its own sake, something the Equal Protection Clause does not permit." *Romer*, 517 U.S. at 635, 134 L. Ed. 2d at 868. "A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government *is itself* a denial of equal protection of the laws in the most literal sense." *Id.* at 633, 134 L. Ed. 2d at 867 (emphasis added) (citations omitted). Because the State has provided Chapter 50B protections to the "majority" of persons in "dating relationships," it cannot deny them to a "minority" without surviving strict

scrutiny review—which it cannot do. *DeShaney*, 489 U.S. at 197 n.3, 103 L. Ed. 2d at 259 n.3 (citation omitted) ("The State may not, of course, selectively deny its protective services to certain disfavored minorities without violating the Equal Protection Clause.").

We further hold that N.C.G.S. § 50B-1(b)(6), as applied to Plaintiff and those similarly situated, cannot withstand even "rational basis" review and, therefore, it would also fail "intermediate scrutiny." There is simply no rational basis that could support this law, in part because there is no cognizable government interest that N.C.G.S. § 50B-1(b)(6) could serve to protect as applied in Plaintiff's case.

4. Review in Cases Alleging State Action Targeted at LGBTQ+ Status

Seventeen years after the Supreme Court upheld a Georgia statute outlawing certain sex acts associated with same-sex relationships in *Bowers v. Hardwick*, 478 U.S. 186, 92 L. Ed. 2d 140 (1986), the Court overruled *Bowers* in *Lawrence*, later noting that "*Bowers* upheld state action that denied gays and lesbians a fundamental right and caused them pain and humiliation." *Obergefell*, 576 U.S. at 678, 192 L. Ed. 2d at 633. *Lawrence* relied heavily on two cases the Court had decided after *Bowers*, one based on due process grounds and the other on equal protection grounds:

> Two principal cases decided after *Bowers* cast its holding into . . . doubt. *In Planned Parenthood [] v. Casey*, [] the Court reaffirmed the substantive force of the liberty protected by the Due Process Clause. The *Casey* decision again confirmed that our laws and tradition afford constitutional protection to personal decisions relating to

47

marriage, procreation, contraception, family relationships, child rearing, and education. In explaining the respect the Constitution demands for the autonomy of the person in making these choices, we stated as follows:

> "These matters, involving the most intimate and personal choices a person may make in a lifetime, choices central to personal dignity and autonomy, are central to the liberty protected by the Fourteenth Amendment. At the heart of liberty is the right to define one's own concept of existence, of meaning, of the universe, and of the mystery of human life. Beliefs about these matters could not define the attributes of personhood were they formed under compulsion of the State."

Persons in a homosexual relationship may seek autonomy for these purposes, just as heterosexual persons do. The decision in *Bowers* would deny them this right.

The second post-*Bowers* case of principal relevance is *Romer v. Evans*. There the Court struck down class-based legislation directed at homosexuals as a violation of the Equal Protection Clause. *Romer* invalidated an amendment to Colorado's Constitution which named as a solitary class persons who were homosexuals, lesbians, or bisexual either by "orientation, conduct, practices or relationships," and deprived them of protection under state antidiscrimination laws. We concluded that the provision was "born of animosity toward the class of persons affected" and further that it had no rational relation to a legitimate governmental purpose.

*Lawrence*, 539 U.S. at 573–74, 156 L. Ed. 2d at 522–23 (citations omitted). In *Casey*, the Supreme Court stated in plain terms that the "liberties" protected by the Fourteenth Amendment have, and will continue to, evolve as society evolves:

The inescapable fact is that adjudication of substantive due process claims may call upon the Court in interpreting the Constitution to exercise that same capacity which by tradition courts always have exercised: reasoned judgment. Its boundaries are not susceptible of expression as a simple rule. That does not mean we are free to invalidate state policy choices with which we disagree; yet neither does it permit us to shrink from the duties of our office. As Justice Harlan observed:

> "Due process has not been reduced to any formula; its content cannot be determined by reference to any code. The best that can be said is that through the course of this Court's decisions it has represented the balance which our Nation, built upon postulates of respect for the liberty of the individual, has struck between that liberty and the demands of organized society. . . . . The balance of which I speak is the balance struck by this country, having regard to what history teaches are the traditions from which it developed as well as the traditions from which it broke. That tradition is a living thing. A decision of this Court which radically departs from it could not long survive, while a decision which builds on what has survived is likely to be sound."

*Casey*, 505 U.S. at 849–50, 120 L. Ed. 2d at 697 (citations omitted).

In *Romer*, the Supreme Court considered of the Colorado amendment, and decided: "Homosexuals, by state decree, are put in a solitary class with respect to transactions and relations in both the private and governmental spheres. The amendment withdraws from homosexuals, but no others, specific legal protection from the injuries caused by discrimination, and it forbids reinstatement of these laws and policies." It was this specific targeting of people of LGBTQ+ status for

discriminatory treatment by the state that the Court found unacceptable and in direct

contradiction to the guarantees of the Fourteenth Amendment:

> Central both to the idea of the rule of law and to our own Constitution's guarantee of equal protection is the principle that government and each of its parts remain open on impartial terms to all who seek its assistance. "'Equal protection of the laws is not achieved through indiscriminate imposition of inequalities.'" Respect for this principle explains why laws singling out a certain class of citizens for disfavored legal status or general hardships are rare. A law declaring that in general it shall be more difficult for one group of citizens than for all others to seek aid from the government is itself a denial of equal protection of the laws in the most literal sense. "The guaranty of 'equal protection of the laws is a pledge of the protection of equal laws.'"

*Romer*, 517 U.S. at 633–34, 134 L. Ed. 2d at 866–67 (citations omitted). The Court

recognized the *particular* harm that is done when state discrimination is directed

against a classification of people who are, and have historically been, subjected to

societal animus. "[L]aws of the kind now before us raise the *inevitable inference* that

the disadvantage imposed is born of animosity toward the class of persons affected."

*Id.* at 634, 134 L. Ed. 2d at 867 (emphasis added) (citation omitted).

The Supreme Court recognized, in *Lawrence*, that its test for determining the

constitutionality of allegedly discriminatory state action against a minority group

included, *as justification for upholding the challenged action*, the fact that

discrimination and animus directed at the targeted minority group had been

considered acceptable and appropriate by the "majority" for some historically

"significant" period of time. *Lawrence*, 539 U.S. at 567, 156 L. Ed. 2d at 518. The Court held this kind of judicial review—one that considered *as the basis* for upholding discriminatory state action the fact that such discrimination not only *existed* in reality, but *was approved of* by a majority of the populace, based upon "historical" and ongoing animus toward the group targeted by the state action—was violative of both the spirit and the constitutional requirements of the Fourteenth Amendment. *Id.*; *see also Obergefell*, 576 U.S. at 671–72, 192 L. Ed. 2d at 628. This truth was further recognized by the Court in *Windsor*, as well as that the fundamental right of "liberty" includes personal "dignity" and "integrity"—the right to make intimate decisions and live one's life in a manner that is true to oneself without unwarranted interference or judgment backed by the laws of the state:

> By its recognition of the validity of same-sex marriages performed in other jurisdictions and then by authorizing same-sex unions and same-sex marriages, New York sought to give further protection and dignity to that bond. For same-sex couples who wished to be married, the State acted to give their lawful conduct a lawful status. This status is a far-reaching legal acknowledgment of the intimate relationship between two people, a relationship deemed by the State worthy of dignity in the community equal with all other marriages. It reflects both the community's considered perspective on the historical roots of the institution of marriage and its evolving understanding of the meaning of equality.

*Windsor*, 570 U.S. at 769, 186 L. Ed. 2d at 826–27 (citation omitted).

In considering a Fourth Amendment challenge to the Defense of Marriage Act ("DOMA"), the Court in *Windsor*, following *Romer*, conducted a review that was, in large part, "animus"-based review:

> DOMA seeks to injure the very class New York seeks to protect. By doing so it violates basic due process and equal protection principles applicable to the Federal Government. The Constitution's guarantee of equality "must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot" justify disparate treatment of that group. In determining whether a law is motived by an improper animus or purpose, "'[d]iscriminations of an unusual character'" especially require careful consideration. *Supra*, at 2692 (quoting *Romer*, *supra*, at 633). DOMA cannot survive *under these principles*.

*Id.* at 769–70, 186 L. Ed. 2d at 827 (emphasis added) (citations omitted); *see also id.* at 772, 186 L. Ed. 2d at 828 (citations omitted) ("By this dynamic DOMA undermines both the public and private significance of state-sanctioned same-sex marriages; for it tells those couples, and all the world, that their otherwise valid marriages are unworthy of federal recognition. . . . The differentiation demeans the couple, whose moral and sexual choices the Constitution protects, and whose relationship [New York] State has sought to dignify."). "DOMA's principal effect is to identify a subset of state-sanctioned marriages and make them unequal. The principal purpose is to impose inequality[.]" *Windsor*, 570 U.S. at 772, 186 L. Ed. 2d at 828. "Under DOMA, same-sex married couples have their lives burdened, by reason of government decree, in visible and public ways." *Id.* "[T]hough Congress has great authority to design

laws to fit its own conception of sound national policy, it cannot deny the liberty protected by the Due Process Clause of the Fifth Amendment"—"the Fifth Amendment itself withdraws from Government the power to degrade or demean in the way this law does, the equal protection guarantee of the Fourteenth Amendment makes that Fifth Amendment right all the more specific and all the better understood and preserved." *Id.* at 774, 186 L. Ed. 2d at 829, 830. "What has been explained to this point should more than suffice to establish that *the principal purpose and the necessary effect of this law* are to demean those persons who are in a lawful same-sex marriage. This requires the Court to hold, as it now does, that DOMA is unconstitutional as a deprivation of the liberty of the person protected by the Fifth Amendment of the Constitution." *Id.* at 774, 186 L. Ed. 2d at 829–30 (emphasis added).

In *Obergefell*, the Court finally held what its opinions in *Romer*, *Lawrence*, and *Windsor* had been trending toward—that the fundamental right to marry attaches to all people, and it is a violation of the Fourteenth Amendment for the state to deprive a person of this fundamental right based solely on who they love and choose to marry. The state cannot deny someone in the LGBTQ+ community the benefit of a constitutionally protected right based *solely* on that person's LGBTQ+ status.[8] The

---

[8] And though there may be some particular set of facts that could survive Fifth or Fourteenth Amendment review for such a law, we do not doubt that such a law, and set of facts, would be the rare exception.

Court, building on *Romer*, *Lawrence*, and *Windsor*, recognized what, in retrospect, was obvious—discrimination, whether newly minted or historically accepted, cannot be the very justification for upholding the law challenged as discriminatory. *Obergefell*, 576 U.S. at 665, 192 L. Ed. 2d at 624–25; *id.* at 671–72, 192 L. Ed. 2d at 628.

> The identification and protection of fundamental rights is an enduring part of the judicial duty to interpret the Constitution. That responsibility, however, "has not been reduced to any formula." . . . . History and tradition guide and discipline this inquiry but do not set its outer boundaries. *That method respects our history and learns from it without allowing the past alone to rule the present.*
>
> The nature of injustice is that we may not always see it in our own times. The generations that wrote and ratified the Bill of Rights and the Fourteenth Amendment did not presume to know the extent of freedom in all of its dimensions, and so they entrusted to future generations a charter protecting the right of all persons to enjoy liberty as we *learn* its meaning. When new insight reveals discord between the Constitution's central protections and a received legal stricture, a claim to liberty must be addressed.

*Id.* at 663–64, 192 L. Ed. 2d at 623–24 (emphasis added) (citations omitted).

> *If rights were defined by who exercised them in the past, then received practices could serve as their own continued justification and new groups could not invoke rights once denied.* This Court has rejected that approach, both with respect to the right to marry and the rights of gays and lesbians. *See Loving*, 388 U.S. 1, 12; *Lawrence*, 539 U.S. at 566–67.

54

> The right to marry is fundamental as a matter of history and tradition, but rights come not from ancient sources alone. They rise, too, from a better informed understanding of how constitutional imperatives define a liberty that remains urgent in our own era. . . . . [W]hen [a] sincere, personal opposition [to same-sex marriage based on "religious or philosophical premises,"] becomes enacted law and public policy, the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied. Under the Constitution, same-sex couples seek in marriage the same legal treatment as opposite-sex couples, and it would disparage their choices and diminish their personhood to deny them this right.

*Id.* at 671–72, 192 L. Ed. 2d at 628–29 (emphasis added) (citations omitted).

The Court's opinion in *Obergefell* establishes that legislation targeting the rights of those in the LGBTQ+ community is subject to something greater than "rational basis" review.[9] The Court in *Obergefell* highlighted the interconnected role of the Due Process Clause's "liberty" guarantees and the right to "equal protection under the law" guaranteed by the Equal Protection Clause, held that the protections of the Fourteenth Amendment apply equally to LGBTQ+ and non-LGBTQ+ persons, and gave particular attention to the *injuries inflicted* by laws targeting LGBTQ+ persons for unequal treatment. *Obergefell*, 576 U.S. at 671–76, 192 L. Ed. 2d at 628–31. The Court concluded:

> It is now clear that the challenged laws burden the liberty of same-sex couples, and it must be further acknowledged

---

[9] The words "rational basis," "intermediate scrutiny," "strict scrutiny," "test," and "review" do not occur in the opinion within any context related to the review conducted by the Court based on the facts before it.

that they abridge central precepts of equality. Here the marriage laws enforced by the respondents are in essence unequal: same-sex couples are denied all the benefits afforded to opposite-sex couples and are barred from exercising a fundamental right. Especially against a long history of disapproval of their relationships, this denial to same-sex couples of the right to marry works a grave and continuing harm. The imposition of this disability on gays and lesbians serves to disrespect and subordinate them. And the Equal Protection Clause, like the Due Process Clause, prohibits this unjustified infringement of the fundamental right to marry.

*Id.* at 675, 192 L. Ed. 2d at 631 (citations omitted). The Court then held "that the right to marry is a fundamental right inherent in the liberty of the person, and under the Due Process and Equal Protection Clauses of the Fourteenth Amendment couples of the same-sex may not be deprived of that right and that liberty." *Id.* at 675–76, 192 L. Ed. 2d at 631. The Court in *Obergefell*, as it did in *Romer*, *Lawrence*, and *Windsor*, was clearly operating pursuant to this principle as it labored to determine the correct standards to apply in the face of government action that had a discriminatory effect on members of the LGBTQ+ community. *Id.* at 675, 192 L. Ed. 2d at 631 (citation omitted) ("*Lawrence* therefore drew upon principles of liberty and equality to define and protect the rights of gays and lesbians, holding the State 'cannot demean their existence or control their destiny by making their private sexual conduct a crime.'"); *id.*, at 675, 192 L. Ed. 2d at 631.

The resulting standard, which must be applied in light of the particular facts of the case under review, is based upon both the Due Process and Equal Protection

Clauses, incorporating both the due process concept of fundamental "liberty" and the equal protection "disparate treatment" review—what we, above, have called "full Fourteenth Amendment" review.[10]  *See Lawrence*, 539 U.S. at 575, 156 L. Ed. 2d at 523 ("Equality of treatment and the due process right to demand respect for conduct protected by the substantive guarantee of liberty are linked in important respects, and a decision on the latter point advances both interests.").  "In any particular case one Clause may be thought to capture the essence of the right in a more accurate and comprehensive way, even as the two Clauses may converge in the identification and definition of the right.  This interrelation of the two principles furthers our understanding of what freedom is and must become." *Obergefell*, 576 U.S. at 672, 192 L. Ed. 2d at 629 (citations omitted).  The Court noted that review based upon the interrelationship between both clauses was not a novel proposition.  *Id.* at 674, 192 L. Ed. 2d at 630–31.  This full Fourteenth Amendment review clearly requires the government to prove more than is required by the "rational basis" test, though the Court has not named or defined the appropriate "test" that should be applied in cases of this nature.  We believe this omission was intentional, and that, in the cases culminating in *Obergefell*, the full Fourteenth Amendment review applied by the Court is a more comprehensive review that does not readily fit within the "rational basis," "intermediate scrutiny," or "strict scrutiny" triad.

---

[10] We recognize that these cases were neither brought nor decided pursuant to the first clause of section 1 of the Fourteenth Amendment, the Privileges and Immunities Clause.

Instead, the Court has focused on (1) the clear intent of the government in passing challenged laws as part of its review, as the clear intent may "belie any legitimate justifications that may be claimed for" the laws, *Romer*, 517 U.S. at 635, 134 L. Ed. 2d at 867; *id.* at 634–35, 134 L. Ed. 2d at 867 (citation omitted) ("'[I]f the constitutional conception of "equal protection of the laws" means anything, it must at the very least mean that a bare . . . desire to harm a politically unpopular group cannot constitute a legitimate governmental interest.'"); (2) the additional impact when majority "opposition becomes enacted law and public policy" and "the necessary consequence is to put the imprimatur of the State itself on an exclusion that soon demeans or stigmatizes those whose own liberty is then denied[,]" *Obergefell*, 576 U.S. at 672, 192 L. Ed. 2d at 629; and (3) the particular harms the laws inflicted on same-sex individuals, couples, and families: "Especially against a long history of disapproval of their relationships, this denial to same-sex couples of the right to marry works a grave and continuing harm. The imposition of this disability on gays and lesbians serves to disrespect and subordinate them[,]" *id.* at 675, 192 L. Ed. 2d at 631; *id.* at 668, 192 L. Ed. 2d at 627 (explaining "children suffer the stigma of knowing their families are somehow lesser" as a result of such laws).

Pursuant to *Romer*, *Lawrence*, *Windsor*, and *Obergefell*, this Court must "dr[a]w upon principles of liberty and equality to define and protect the rights of gays and lesbians," and insure "the State '[does not] demean their existence or control their

destiny'" through legislation that "impos[es] . . . disabilit[ies] on gays and lesbians serv[ing] to disrespect and subordinate them[,]" *id.* at 675, 192 L. Ed. 2d at 631; "impose[s] stigma and injury of the kind prohibited by our basic charter[,]" *id.* at 670–71, 192 L. Ed. 2d at 628; or constitutes an "unjustified infringement [upon their] fundamental right[s,]" *id.* at 675, 192 L. Ed. 2d at 631 (citations omitted).

From our review, we hold that *Obergefell* counsels, in relevant part, the following: (1) Laws that serve to deny members of the LGBTQ+ community rights afforded to non-LGBTQ+ individuals are highly suspect, and a reviewing court *must* consider a number of factors that will weigh against the constitutionality of such a law; among these factors (2) the reviewing court must consider the *actual* intent of the state in enacting the law, if possible—whether indicated by its plain language, consideration of the law's real-world impact, through historical and legislative review including the failure to amend a law that is unnecessarily discriminatory in fact;[11] (3) the court must consider the *particular* harms suffered by LGBTQ+ persons when the State denies them equal rights to liberty and access to the law based on their LGBTQ+ status; (4) the court must factor that the particular harms suffered are

---

[11] Neither the government's stated intent—unless determined to be the same as its actual intent, nor any *hypothetically conceivable* legitimate purpose, shall serve to mitigate the weight given to the harm that results when "the imprimatur of the State itself on an exclusion[ary law] . . . demeans or stigmatizes those whose own liberty is then denied." *Obergefell*, 576 U.S. at 672, 192 L. Ed. 2d at 629; *see also Lawrence*, 539 U.S. at 580, 156 L. Ed. 2d at 526–27 (citations omitted) ("We have consistently held . . . that some objectives, such as 'a bare . . . desire to harm a politically unpopular group,' are not legitimate state interests. When a law exhibits such a desire to harm a politically unpopular group, we have applied a more searching form of rational basis review to strike down such laws under the Equal Protection Clause.").

based in part on "a long history of disapproval of the[] relationships" between LGBTQ+ persons, *id.* at 675, 192 L. Ed. 2d at 631; (5) the court must assess the injury that occurs when official State action, which singles out members of the LGBTQ+ community for the denial of rights afforded non-LGBTQ+ persons—including that such action imposes a state-sanctioned "stigma" upon LGBTQ+ individuals which "diminishes" them, "demeans their existence," interferes with their "autonomy" and "control of their destiny," impugns their "dignity," and serves to unfairly call into question their rightful place as equal members of society—as equal "citizens," *id.* at, 670–71, 675, 192 L. Ed. 2d at 628, 631 (citations omitted).

These factors must be weighed against whatever legitimate interest is advanced by the challenged action, considering the context and particular facts involved. The Court in *Obergefell* emphasized the importance of the principle that "'[t]he freedom secured by the Constitution consists, in one of its essential dimensions, of the right of the individual not to be injured by the unlawful exercise of governmental power[,]" *id.* at 677, 192 L. Ed. 2d at 632 (alteration in original) (citation omitted), and held "the Equal Protection Clause, like the Due Process Clause, prohibits this unjustified infringement of [a] fundamental right" denied based upon a person's LGBTQ+ status, *id.* at 675, 192 L. Ed. 2d at 631.

We hold in this case that N.C.G.S. § 50B-1(b)(6) does not survive this balancing test. "A State cannot so deem a class of persons a stranger to its laws." *Romer*, 517

U.S. at 635, 134 L. Ed. 2d at 868. Plaintiff has asked this Court "for equal dignity in the eyes of the law. The Constitution grants [Plaintiff] that right." *Obergefell*, 576 U.S. at 681, 192 L. Ed. 2d at 635. The Act fails to survive the review required pursuant to our analyses of *Romer*, *Lawrence*, *Windsor*, and *Obergefell*, and we so hold.

### D. *Bostock v. Clayton County*

#### 1. The Decision

The United States Supreme Court recently decided *Bostock*, 590 U.S. __, 140 S. Ct. 1731, 207 L. Ed. 2d 218, which this Court finds relevant to our review. Writing for the majority, Justice Gorsuch noted: "Few facts are needed to appreciate the legal question we face. Each of the three cases before us started the same way: An employer fired a long-time employee shortly after the employee revealed that he or she is homosexual or transgender—and allegedly for no reason other than the employee's homosexuality or transgender status." , *Id.* at __, 140 S. Ct. at 1737, 207 L. Ed. 2d at ___. The Court was deciding a statutory challenge to part of Title VII—42 U.S.C. § 2000e-2(a)(1): "This Court normally interprets a statute in accord with the *ordinary public meaning* of its terms at the time of its enactment. After all, only the words on the page constitute the law adopted by Congress and approved by the President"—42 U.S.C. § 2000e-2 was enacted in 1964. *Bostock*, 590 U.S. at __, 140 S. Ct. at 1738, 207 L. Ed. 2d at ___ (emphasis added) (citation omitted). Further, the

Court added, "we must be attuned to the possibility that a statutory phrase ordinarily bears a different meaning than the terms do when viewed individually or literally." *Id.* at ___, 140 S. Ct. at 1750, 207 L. Ed. 2d at ___. The Court stated in relevant part: "With this in mind, our task is clear. We must determine the *ordinary public meaning* of Title VII's command that it is 'unlawful . . . for an employer to . . . discriminate against any individual . . . *because of* such individual's . . . *sex*[.]' § 2000e–2(a)(1)." *Id.* at ___, 140 S. Ct. at 1738, 207 L. Ed. 2d at ___ (emphasis added) (citation omitted).

In *Bostock*, "The only statutorily protected characteristic at issue . . . [was] 'sex[.]'" *Id.* at ___, 140 S. Ct. at 1739, 207 L. Ed. 2d at ___. "Appealing to roughly contemporaneous dictionaries, the employers [argued] that, as used here, the term 'sex' in 1964 referred to 'status as either male or female [as] determined by reproductive biology.'" *Id.* The Court stated that it would "proceed on the *assumption* that 'sex' signified what the employers suggest, referring only to biological distinctions between male and female[,]" "because nothing in our approach to these cases turns on the outcome of the parties' debate [concerning the definition of 'sex'], and because the employees concede the point *for argument's sake*[.]" *Id.* (emphasis added). Therefore, the Court focused on whether, pursuant to a plain language reading, discrimination "because of" an employee's "sex"—even when narrowly defined as limited to reproductive biology—included discrimination based upon a person's status as gay, lesbian, or transgender. The Court noted that, applying the

restricted definition of "sex" argued by the employers, and the "ordinary meaning" of

"because of," the statute required at a minimum proof of "but-for" causation:

> [T]he statute prohibits employers from taking certain actions "because of " sex. And, as this Court has previously explained, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'" In the language of law, this means that Title VII's "because of" test incorporates the "'simple'" and "traditional" standard of but-for causation. That form of causation is established whenever a particular outcome would not have happened "but for" the purported cause. In other words, a but-for test directs us to change one thing at a time and see if the outcome changes. If it does, we have found a but-for cause.

*Id.* (citations omitted). The Court held:

> It doesn't matter if other factors besides the plaintiff's sex contributed to the decision [to fire the employee]. And it doesn't matter if the employer treated women as a group the same when compared to men as a group. If the employer intentionally relies in part on an individual employee's sex when deciding to discharge the employee— put differently, if changing the employee's sex would have yielded a different choice by the employer—a statutory violation has occurred.

*Id.* at ___, 140 S. Ct. at 1741, 207 L. Ed. 2d at ___. The Court gives plenary examples

to demonstrate the principles and logic behind this holding, which are instructive.

*See Id.* at ___, 140 S. Ct. at 1741–49, 207 L. Ed. 2d at ___. Although in *Bostock* the

Court was construing a statute, its definitions and analysis are relevant to due

process and equal protection claims, in that it holds the definition of "sex," absent any

qualifying language, includes "homosexuals" or "transgender" people when the issue

is discrimination or disparate treatment based, at least in part, on the *status* of a person as "homosexual" and "transgender"—*i.e*, based on a person's sexual orientation or gender identity.

Therefore, the majority held that discrimination against someone because that person is "homosexual" or "transgender"—*i.e.*, based on who that person chooses to have intimate relations with, or the gender identity with which the person identifies—constitutes discrimination against that person, at least in part, based on their gender, or "sex;"

> Today, we must decide whether an employer can fire someone simply for being homosexual or transgender. The answer is clear. An employer who fires an individual for being homosexual or transgender *fires that person for traits or actions it would not have questioned in members of a different sex. Sex plays a necessary and undisguisable role in the decision[.]*

*Id.* at ___, 140 S. Ct. at 1737, 207 L. Ed. 2d at ___ (emphasis added); *id.* at ___, 140 S. Ct. at 1742, 207 L. Ed. 2d at ___ ("an employer who intentionally treats a person worse because of sex—such as by firing the person for actions or attributes it would tolerate in an individual of another sex—discriminates against that person"). The Court reasoned:

> [H]omosexuality and transgender status are inextricably bound up with sex. Not because homosexuality or transgender status are related to sex in some vague sense or because discrimination on these bases has some disparate impact on one sex or another, but because *to discriminate on these grounds requires [the] . . .*

> *intentiona[l] treat[ment of] individual[s] . . . differently because of their sex.*

*Id.* at ___, 140 S. Ct. at 1742, 207 L. Ed. 2d at ___ (emphasis added).

Neither does it affect the analysis if an employer "is equally happy to fire male *and* female employees who are homosexual or transgender." *Id.* Further, "the plaintiff's sex need not be the sole or primary cause of the employer's adverse action. . . . . [The analysis does not change i]f another factor—s*uch as the sex the plaintiff is attracted to or presents as*—might also be at work, or even play a more important role in the employer's decision." *Id.* at ___, 140 S. Ct. at 1744, 207 L. Ed. 2d at ___ (emphasis added). The Court held: "We do not hesitate to recognize today . . .: An employer who fires an individual merely for being gay or transgender" is discriminating against that person because of that individual's "sex." *Id.* at ___, 140 S. Ct. at 1754, 207 L. Ed. 2d at ___. "The fact that [it is the combination of] female sex *and* attraction to women [that] can . . . get an employee fired does no more than show the same outcome can be achieved through the combination of different factors. In either case . . . sex plays an essential but-for role." *Id.* at ___, 140 S. Ct. at 1748, 207 L. Ed. 2d at ___ (emphasis added). The context surrounding the discriminatory act must be factored into the analysis, and that includes the "sex" of a complainant's partner, or the "sex" of the complainant at birth, as determined by biology. *Id.*

### 2. Relevance to Plaintiff's Appeal

We first note that the Supreme Court has held that "because of" language used to determine a "discriminatory purpose" when required for an Equal Protection Clause challenge "applies to the 'class-based, invidiously discriminatory animus' requirement of" federal statutes. Therefore, the Court's analysis of Title VII in *Bostock* is also relevant to similar requirements imposed by the Fourteenth Amendment in the case before us. *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 272, 122 L. Ed. 2d 34, 48 (1993) (citations omitted). Though *Bostock* was decided by statutory interpretation of certain language in Title VII, the reasoning in *Bostock* in support of its determination, that "*it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex*[,]" includes a common, plain language definition of "sex" in the context of discrimination that, absent some exclusionary language, must logically include sexual-orientation and gender identity. *Bostock*, 590 U.S. at ___, 140 S. Ct. at 1741, 207 L. Ed. 2d at ___ (emphasis added). Therefore, the definition of "sex" in *Bostock* should apply equally to any law denying protections or benefits to people based upon sexual orientation or gender identity—disparate treatment based on these "statuses" is disparate treatment based, at least in part, upon "sex" or gender. *See id.*

This Court has conducted an analysis similar to that in *Bostock* concerning the meaning of "racial animus" in a statute increasing punishment for certain crimes

committed "with racial animus," and reached an analogous conclusion. *See* N.C.G.S. § 14-3 (2019); *State v. Brown*, 202 N.C. App. 499, 503, 689 S.E.2d 210, 213, *disc. review denied*, 364 N.C. 243, 698 S.E.2d 657 (2010). In *Brown*, the defendant "argue[d] that because both he and Peterson[, the victim,] [we]re of the same race, . . . the ethnic animosity statute, [could ]not apply." *Brown*, 202 N.C. App. at 503, 689 S.E.2d at 213. N.C.G.S. § 14-3(c) mandates increased sentences when certain misdemeanors are "committed because of the victim's race, color, religion, nationality, or country of origin[.]" N.C.G.S. § 14-3(c). This Court looked in part to Title VII opinions for guidance and noted: "There is nothing in either the language of [the statute], or the title of the bill, to suggest the General Assembly intended a narrow construction of what constituted 'ethnic animosity' or acts 'committed because of the victim's race or color.'" *Brown*, 202 N.C. App. at 508, 689 S.E.2d at 215. We held that a white man who assaults another white man based, in part, on the defendant's objection to the victim's romantic relationship with an African-American woman, has committed the assault "'because of the victim's race or color'":

> Had Peterson been an African–American, Defendant might not have shot at Peterson. Therefore, the jury could reasonably find that Defendant[, a white man,] only shot at Peterson *because Peterson was white*, and Defendant was acting out his disgust with, or anger towards, Peterson because of Peterson's relationship with a woman of a different race or color.

*Id.* at 508, 689 S.E.2d at 215–16 (emphasis added).

67

When an equal protection challenge is raised: "Our decisions . . . establish that the party seeking to uphold a statute that classifies individuals on the basis of their *gender* must carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724, 73 L. Ed. 2d 1090, 1098 (1982) (emphasis added) (citations omitted). Therefore, the Supreme Court's definition of "sex," or gender, in *Bostock* is relevant in this Court's review of Plaintiff's Fourteenth Amendment challenge before us.

In this case, N.C.G.S. § 50B-1(b)(6) limits the protections of DVPOs to "persons of the opposite sex who are in a dating relationship or have been in a dating relationship." N.C.G.S. § 50B-1(b)(6). The plain language of the statute specifically denies the protections of DVPOs to similarly situated "persons of the [same] sex who are in a dating relationship or have been in a dating relationship." N.C.G.S. § 50B-1(b)(6) (alteration in bracket). Pursuant to well-established precedent, cited above, and the reasoning in *Bostock*, N.C.G.S. § 50B-1(b)(6), on its face, treats similarly situated people differently based upon their "sex" or gender. Pursuant to *Bostock*, "An individual's homosexuality or transgender status is not relevant [to the review]. That's because *it is impossible* to discriminate against a person for being homosexual or transgender *without discriminating against that individual based on sex.*" *Bostock*, 590 U.S. at ___, 140 S. Ct. at 1741, 207 L. Ed. 2d at ___ (emphasis added). As we have already held above, N.C.G.S. § 50B-1(b)(6) does not survive "intermediate

68

scrutiny," which applies in cases where the alleged government discrimination is based on "sex" or gender and, therefore, the statute does not survive application to Plaintiff pursuant to the review demanded by *Bostock*.

## VI. Amicus Curiae

We must now address certain issues involving this Court's appointment of an *amicus curiae* to brief counterarguments to Plaintiff's appeal. The trial court entered two final judgments on 7 June 2018, the 50B Order that denied Plaintiff's request for a DVPO, and the 50C Order that granted Plaintiff a "permanent" civil no-contact order. In both of these orders, the trial court indicated that it would have granted Plaintiff's request for a DVPO had Plaintiff been a man—a person of the opposite "sex" from Defendant. Plaintiff gave notice of appeal from the 50B Order. Approximately three months after Plaintiff's request for a DVPO was denied, Defendant informed the trial court by a letter, dated 8 September 2018, that she did not "want [to] be involved."

This appeal involves issues of great public interest, the decision of which will affect the protections available to individuals of LGBTQ+ status who suffer domestic violence. Therefore, this Court's decision will have an impact far beyond the immediate impact it will have on Plaintiff and Defendant. The public interest in the resolution of Plaintiff's appeal is in part demonstrated by the fact that, on appeal,

Plaintiff is represented by attorneys representing ACLU of North Carolina Legal Foundation along with Plaintiff's trial attorney.

Notably, the State of North Carolina, in its *amicus* brief, does *not* defend the constitutionality of N.C.G.S. § 50B-1(b)(6), noting that "the State maintains a variety of programs to assist victims of domestic violence" and "the State also has a related interest in ensuring that all its people are treated equally under the law. This interest is particularly [strong] . . . where certain groups are being denied equal legal protections from private violence[,]" because "[t]he State and its law-enforcement community have an obligation to ensure the safety and security of all North Carolinians, without regard to their sexual orientation." The Governor moved to join the State's *amicus* brief, noting "[t]his case concerns whether persons in same-sex relationships should be afforded equal legal rights and protections from domestic violence" and stating the "Governor shares the State's strong interest in ensuring that law enforcement has robust tools at its disposal to prevent and punish all forms of domestic violence." The Governor "also shares the State's overlapping interest in ensuring that all North Carolinians are treated equally under the law."

Additionally, an *amicus* brief was filed by

> North Carolina Coalition Against Domestic Violence [("NCCADV")]; Legal Aid of North Carolina [("LANC")]; and several local domestic violence support organizations, including Albemarle Hopeline, serving Camden, Chowan, Currituck, Gates, Pasquotank, and Perquimans Counties; Center for Family Violence Prevention, serving Pitt,

> Martin, and Washington Counties; Cleveland County Abuse Prevention Council, Inc., serving Cleveland County; Compass Center for Women and Families, serving Orange County; Domestic Violence Shelter and Services, Inc., serving New Hanover County; Durham Crisis Response Center, serving Durham County; Families First, serving Bladen and Columbus Counties; Family Service of the Piedmont, serving Guilford County and the Central Hub of the LGBTQ Capacity Building Grant serving 25 counties; Helpmate Domestic Violence Services, serving Buncombe County; Hoke County Domestic Violence and Sexual Assault Center, serving Hoke County; Outer Banks Hotline, Inc., serving Dare County; InterAct, serving Wake County; A Safe Home for Everyone, serving Ashe County; and Southeastern Family Violence Center, serving Robeson County.

NCCADV states that it "strives to empower all North Carolina communities to build a society that prevents and eliminates domestic violence" as "a nonprofit agency that leads the state's movement to end domestic violence and to enhance work with survivors through collaborations, innovative trainings, prevention, technical assistance, state policy development and legal advocacy." LANC "is a statewide, nonprofit law firm that provides free legal services in civil matters to low-income people in order to ensure equal access to justice."

Another *amicus* brief was filed by "'North Carolina LGBTQ+ Non-Profit Organizations'" ("NCLNPO"), comprised of statewide and southeastern regional divisions of Equality N.C., Campaign for Southern Equality, Safe Schools NC, Inc., four organizations based in the law schools of North Carolina Central University, the University of North Carolina, Wake Forest University, and Duke University, as well

as an additional ten non-profit organizations providing support for the LGBTQ+ community in North Carolina. NCLNPO is "interested in ensuring that victims of same-sex domestic violence receive the same state protections as victims of opposite-sex domestic violence."

However, no appellee brief was filed by, or on behalf of, Defendant, nor did any *amici* request to file briefs in support of the constitutionality of N.C.G.S. § 50B-1(b)(6). Therefore, this Court was left to decide the important matter before us without the benefit of competing appellate arguments. In light of this deficit, this Court, by order entered 3 May 2019 (the "Appointing Order"), appointed *Amicus* "to defend the ruling of the trial court"; because the parties and the public interest would be best served by the addition of a brief setting forth a well-considered argument for the constitutionality of N.C.G.S. § 50B-1(b)(6).

*Amicus* was directed to argue the *correctness* of the trial court's ruling, *including* its reasoning, and to contest Plaintiff's arguments, in order to provide this Court with an independent source of legal argument addressing the fundamental issues of important public interest raised by Plaintiff's appeal—whether the trial court's refusal to grant Plaintiff a Chapter 50B DVPO constituted an as-applied violation of Plaintiff's constitutional rights. This was the issue of broad public interest raised by the trial court's ruling in the 50B Order and the issue that motivated this Court to appoint *Amicus*.

The Appointing Order states in part:

> In the absence of a brief on behalf of appellee, the Court appoints [*Amicus*] to appear as court assigned amicus curiae in the above-captioned appeal to defend the ruling of the trial court.

> [*Amicus*] shall file an amicus curiae brief not exceeding 8,750 words in length within thirty days of the date of this order. The appellant may file a reply brief not exceeding 3,750 words in length in response to the brief of amicus curiae[.]

### A. Role of Assigned Amici Curiae

"As a general matter, appointing an amicus is reserved for rare and unusual cases that involve questions of general or public interest[.]" 4 Am. Jur. 2d Amicus Curiae § 3 (citations omitted). We review, below, the responsibilities of *amici curiae*, as well as the legal limits of the powers that may be conferred upon *amici curiae*, and clarify the non-litigating status of *amici curiae*, whether appointed by the Court acting *sua sponte* or in response to motions duly filed.

> *Amicus curiae* is a Latin phrase for "friend of the court" *as distinguished from an advocate* before the court. It serves only for the benefit of the court, assisting the court in cases of general public interest, by making suggestions to the court, . . . and by insuring a complete and plenary presentation of difficult issues so that the court may reach a proper decision.

> An *amicus curiae* is *not a party to the litigation* and therefore does not necessarily represent the views or interests of either party. Since an *amicus does not represent the parties* but participates only for the benefit of the court, *it is solely within the discretion of the court to*

> *determine the fact, extent, and manner of participation* by
> the *amicus.*

*Alexander v. Hall*, 64 F.R.D. 152, 155 (D.S.C. 1974) (emphasis added) (citations

omitted) (*see also*omitted citations).  However, the powers a court may grant *amici*

are limited by the law.  Some additional general powers granted, and limitations

attached, to an *amicus curiae* follow:

> An amicus curiae is not a party and generally cannot
> assume the functions of a party, or an attorney for a party.
> . . . .  When amicus status is granted, *the named parties
> should always remain in control, with the amicus merely
> responding to the issues presented by the parties.*
>
> . . . .
>
> An amicus curiae has *no control over the litigation* and *no
> right to institute any proceedings* in it.  An amicus curiae is
> not vested with the management of the case.  He or she is
> not bound by the judgment of the court, nor can he or she
> appeal it, except in rare circumstances.  Moreover, an
> amicus curiae ordinarily cannot conduct discovery or *file*
> pleadings or *motions in the cause* but is restricted to
> suggestions relative to matters apparent *on the record* or to
> matters of practice.  *It is not the proper role of an amicus to
> comment on the existence of allegedly newly discovered
> evidence.*

4 Am. Jur. 2d Amicus Curiae § 6 (emphasis added) (citations omitted); *see also* 3B

C.J.S. Amicus Curiae § 3; *Knetsch v. United States*, 364 U.S. 361, 370, 5 L. Ed. 2d

128, 134 (1960) (refusing to consider an argument "made in an amicus curiae brief,"

the Supreme Court held: "This argument has never been advanced by petitioners in

this case.  Accordingly, we have no reason to pass upon it."); *Evans v. Georgia Reg'l*

*Hosp.*, 850 F.3d 1248, 1257–58 (11th Cir. 2017) (citations omitted) ("Moreover, without 'exceptional circumstances, *amici curiae* may not expand the scope of an appeal to implicate issues not presented by the parties to the district court.'"); *Richardson v. Ala. State Bd. of Educ.*, 935 F.2d 1240, 1247 (11th Cir. 1991) (citation omitted) ("Although this court granted amici's motion for leave to file a brief, the arguments raised only by amici may not be considered. This court has recently held that an appellate court will not consider issues not presented to the trial court[.] We will not consider on appeal . . . defenses that were neither raised in the district court nor argued by appellants on appeal."); *United States v. State of Mich.*, 940 F.2d 143, 165 (6th Cir. 1991) (emphasis added) (citations omitted) ("amicus has been *consistently precluded from* initiating legal proceedings, filing pleadings, or otherwise *participating and assuming control of the controversy* in a totally adversarial fashion"); *Miller-Wohl Co., Inc. v. Comm'r of Labor & Indus.*, 694 F.2d 203, 204 (9th Cir. 1982) (citations omitted) ("[T]he classic role of *amicus curiae* [consists of] assisting in a case of general public interest . . . and drawing the court's attention to law that escaped consideration. Courts have rarely given party prerogatives to those not formal parties. A petition to intervene and its express or tacit grant are prerequisites to this treatment."); *Common Cause v. Bolger*, 512 F. Supp. 26, 35 (D.D.C. 1980) (citations omitted) (finding the notion "that amicus curiae has standing

to raise arguments not pressed by the parties" a "dubious assumption" only found in "rare extraordinary cases").

North Carolina has adopted federal law regarding the powers and limitations of *amici curiae*. *See McCracken & Amick, Inc. v. Perdue*, 201 N.C. App. 480, 484 n.3, 687 S.E.2d 690, 693 n.3 (2009) ("As the issue is raised only in the *amici curiae's* brief, we decline to address the issue in the absence of exceptional circumstances. *See Artichoke Joe's Ca[l.] Grand Casino v. Norton*, 353 F.3d 712, 719 n.10 (9th Cir.[ ]2003) (citation omitted) (declining to address whether a tribe was necessary party to challenge the validity of tribal-state gaming compacts because the issue was 'raised only in an amicus brief'), *cert. denied*, 543 U.S. 815 (2004)."). Further, as discussed by our Supreme Court:

> A judgment *regular upon the face of the record* is presumed to be valid until the contrary is shown *in a proper proceeding*.
>
> Moreover, it is to be noted that an *amicus curiae* may *not assume the place of a party* in a legal action. Nor may he *take over the management of a suit*. And he has *no right to institute proceedings* therein. He *takes the case as he finds it*. 3 C.J.S. Amicus Curiae § 3, p. 1049. It follows that the *amicus curiae* was *not a competent person . . . to make the jurisdictional affidavit*[.] The affidavit made by [*amicus*] is a *nullity*. . . . .
>
> We have given consideration to the argument made by the *amicus curiae* to the effect that the facts of this case take it out of the general rule which requires that a direct attack on a voidable judgment may be made only by a party or privy. . . . . The *amicus curiae* says in his brief that "The

integrity of the judicial process and the public welfare demand that there be a hearing of this matter on the merits[.]" . . . . We cannot accept the premise or the arguments based thereon. If this judgment . . . is subject to attack by the *amicus curiae* appointed for that purpose, then other judgments, and any number of them, are subject to be attacked the same way. If we approve the appointment of this *amicus curiae* for the performance of the duties assigned him by the court, then other *amici curiae*, and any number of them, may be appointed . . . to work over any . . . other judgments . . . in which it is suspected that fraud was perpetrated on the court. *The practice could lead to a serious weakening of the rule that a motion in the cause directly attacking a judgment may be made only by a party to the action* or by one in privity with a party. Moreover, *to approve the unprecedented procedure adopted below would be a step toward undermining the integrity of personal and property rights acquired on the faith of judicial proceedings, as well as the public interests involved in the finality and conclusiveness of judgments.*

*Shaver v. Shaver*, 248 N.C. 113, 119–20, 102 S.E.2d 791, 796–97 (1958) (emphasis added); *see also Cape Hatteras Elec. Membership Corp. v. Stevenson*, 249 N.C. App. 11, 16, 790 S.E.2d 675, 679 (2016) (*citing Poore v. Poore*, 201 N.C. 791, 792, 161 S.E. 532, 533 (1931)) ("Amicus contends that these bylaws are 'common' among electric cooperatives and guidance is needed. But the parties have not briefed this issue, and we are unwilling to delve into this sort of advisory dicta without an appropriate record and argument from the parties."); *Crockett v. First Fed. Sav. & Loan Ass'n of Charlotte*, 289 N.C. 620, 632, 224 S.E.2d 580, 588 (1976) (refusing to consider argument in *amicus curiae* brief that federal law preempted the field covering the plaintiff's action, *thereby depriving the trial court of subject matter jurisdiction,*

because "[a]t no time have the parties in this action addressed themselves to the question of the applicability of federal law").

Opinions limiting the standing of *amici curiae* to the record and arguments *as developed by the parties* are plenary:

> The critical point is that an impartial friend of the court steps out of the role of amicus when it essentially assumes the role of being not just adversarial but a "party in interest to the litigation." There has, therefore, "been a bright-line distinction between amicus curiae and named parties/real parties in interest."

*Wyatt By & Through Rawlins v. Hanan*, 868 F. Supp. 1356, 1358 (M.D. Ala. 1994) (citations omitted). The Sixth Circuit has held that court appointed *amici curiae* are "without standing to compel the disclosure of . . . [new evidence], or to exercise any litigating rights equal to a named party/real party in interest[.]" *State of Mich.*, 940 F.2d at 166.

Our Supreme Court has treated the powers of *amici curiae* similarly:

> The amicus curiae brief, in addition to presenting an argument under state law similar to that of defendant, asserts that federal law preempts the field insofar as "due-on-sale" clauses in loan instruments of federal savings and loan associations are concerned. The amicus curiae then argues that under federal law the due-on-sale clause involved in this case is valid. At no time have the parties in this action addressed themselves to the question of the applicability of federal law or incorporated by reference the amicus curiae brief. Under Rule 28, N.C. Rules of Appellate Procedure, appellate review is limited to the arguments upon which the parties rely in their briefs.

*Crockett*, 289 N.C. at 632, 224 S.E.2d at 588 (citation omitted); N.C. R. App. P. 28. Allowing an appointed *amicus* to act as a party in interest "is not proper because it injects an element of unfairness into the proceedings[.] The [appellants] in this case are entitled to have their contentions and arguments" considered as presented on appeal. *Leigh v. Engle*, 535 F. Supp. 418, 422 (N.D. Ill. 1982). Therefore, "'[i]n view of the rule that an amicus curiae must accept the case before the court with issues as made by the parties, a new question raised only in a brief filed by an amicus curiae, by leave of court, will not be considered.'" *United States v. Barnett*, 330 F.2d 369, 423 n.6 (5th Cir. 1963) (citations omitted), *certified question answered*, 376 U.S. 681, 12 L. Ed. 2d 23 (1964). Further, *amici curiae* are limited to questions of law, not fact. If an *amicus curiae* discovers new or additional facts that are not included in the record on appeal, it may not argue these extra-record facts in support of its legal arguments. *See United States v. F.M. Jabara & Bros.*, 19 C.C.P.A. 76, 79 (1931). This rule is in place to avoid prejudice to the appellant's appeal, which is reliant on the settled record on appeal.

In this matter, Defendant prevailed in the Chapter 50B action, entered into a consent order with Plaintiff in the Chapter 50C action, and did not cross-appeal or file an appellee brief. The purpose of the Appointing Order was to obtain briefing from *Amicus* on any potentially meritorious arguments contradicting Plaintiff's appellate arguments and those of the supporting *amici*. As a service to this Court

and the citizens of North Carolina, *Amicus* agreed to undertake this role. *Amicus* apparently wanted to alert this Court to possible *alternative* options for affirming the 50B Order, believing this Court had the power to confer that authority, and that we had in fact conferred upon *Amicus* that duty and the authority to undertake it. *Amicus'* has participation in this appeal is as though *Amicus* was Defendant's counsel, and the *amicus curiae* brief was Defendant's appellee brief. *Amicus* also filed certain motions that *Amicus* lacked the standing to file—meaning this Court lacks subject matter jurisdiction over those motions and cannot consider them. This Court is also without the authority to consider any arguments made by Amicus that are not responsive to Plaintiff's appellate arguments and limited to the record as settled by the parties to Plaintiff's action. In light of the apparent uncertainty in this area, we seek to provide clear guidance on the expectations, definitions, powers, and limitations of *amici curiae*.[12]

B. *The Mandate of This Court's "Assigned* Amicus Curiae*"*

In this case, the trial court clearly articulated the reasoning in support of its ruling: that it believed it lacked the authority or jurisdiction to grant a DVPO to Plaintiff because Plaintiff and Defendant were not of the "opposite sex" and,

---

[12] This Court expresses its appreciation to *Amicus* in this case for accepting the challenge presented, and for the zealous and thorough attention given. Although the wording in the Appointing Order is similar to that commonly used in similar situations, this Court will endeavor in the future to more clearly set the parameters of its appointing mandates, including the limits of appointed *amici curiae's* standing and authority to act in an appeal to avoid unnecessary confusion.

therefore, not in a "dating relationship" constituting a "personal relationship" as defined by N.C.G.S. § 50B-1(b)(6). According to the trial court's orders, it determined it could not grant Plaintiff a DVPO under N.C.G.S. § 50B-1(b)(6) because acts perpetrating or threatening to perpetrate "bodily injury" against another, or "[p]lacing the aggrieved party . . . in fear of imminent serious bodily injury or continued harassment[,]" are only considered acts of "domestic violence" if the abuser and the victim are "of opposite sex." N.C.G.S. §§ 50B-1(a), (b)(6). The trial court found and concluded that *had* Plaintiff and Defendant been "of opposite sex," Plaintiff's complaint for a DVPO would have been granted. In so ruling, the trial court rejected Plaintiff's argument that the trial court should grant her request for a DVPO, stating, before Plaintiff made her constitutional argument, that Plaintiff's "complaint . . . would [not] survive a Rule 12 motion."

Plaintiff's counsel responded to the trial court:

> I understand . . . that you don't believe it would survive a motion to dismiss. However . . . we do feel that at this point [Plaintiff] should be allowed to proceed with the [DVPO], that . . . the statute, that 50B, is unconstitutional as it's written post the same-sex marriage equality case from the Supreme Court in *Obergefell* and that there's no rational basis at this point to have a statute that limits dating relationships to folks of opposite sex.

The trial court asked about the legislative history of N.C.G.S. § 50B-1, and Plaintiff's attorney informed the trial court that "our legislature has amended 50B for different reasons, but they have not amended the personal relationship categories

any time in the recent past[.]" The trial court rejected Plaintiff's argument and stated that it would not consider whether Plaintiff's constitutional rights were violated, supporting its ruling, in part, based on the following:

> N.C.G.S. 50B was last amended by the legislature in 2017 without amending the definition of "personal relationship" to include persons of the same sex who are in or have been in a dating relationship. This recent amendment in 2017 was made subsequent to the United States Supreme Court decision in *Obergefell v. Hodges,* . . . and *yet the legislature did not amend the definition of personal relationship to include dating partners of the same sex.*

(Emphasis added.) The trial court continued:

> 4. Th[e] definition [in N.C.G.S. § 50B-1(b)(6)] prohibits victims of domestic violence in same sex dating relationships that are not spouses, ex-spouses, or current or former household members from seeking relief against a batterer under Chapter 50B.
>
> 5. [This court] must consider *whether it has jurisdiction to create a cause of action that does not exist and to enter an order under this statute when the statute specifically excludes it.* The *difficult answer to this question is no,* it does not. The General Assembly has the sole authority to pass legislation that allows for the existence of any [DVPO]. The legislature has not extended this cause of action to several other important family relationships including siblings, aunts, uncles, "step" relatives, or in-laws.
>
> 6. In this context, *the Courts only have subject matter jurisdiction and the authority to act and enjoin a defendant when the legislature allows it.* On numerous occasions the Court of Appeals has stricken orders entered by the District Court that do no[t] include proper findings of fact or conclusions of law that are necessary to meet the statute.

> *. . . [This court] cannot enter a domestic violence protective order against a [d]efendant when there is no statutory basis to do so.*
>
> . . . .
>
> Plaintiff has failed to prove grounds for issuance of a [DVPO] as Plaintiff does not have a required "personal relationship" with [ ] Defendant as required by [Chapter] 50B.

(Emphasis added).

The trial court further found: "A civil no-contact (50C) order was granted contemporaneously <u>on the same allegations</u> *and had the parties been of opposite genders, those facts would have supported the entry of a [DVPO] (50B)."* (Emphasis added). The trial court concluded: "The General Assembly has the sole authority to pass legislation that allows for the existence of any [DVPO]"; the trial court "only ha[d] subject matter jurisdiction and the authority to act and enjoin a defendant when the legislature allows it"; and, in this case, "[t]he legislature has not extended this cause of action to several other important family relationships" including same-sex dating relationships as defined by N.C.G.S. § 50B-1(b)(6).

*Amicus* was also free to make any non-frivolous arguments sufficiently related to the issues of public interest that prompted appointment of *Amicus* in the first instance. This Court was not seeking new issues to decide; we were requesting well-briefed counterarguments to the issues already presented to us in Plaintiff's appellate brief. *See Newark Branch, N.A.A.C.P. v. Town of Harrison*, 940 F.2d 792, 808–09 (3d

Cir. 1991) (including the following partial citation: "*Berry v. Doles*, 438 U.S. 190, 202 (1978) (Rehnquist, J., dissenting) (*amicus curiae* has no standing to request relief not requested by the parties")).  Further, *Amicus'* counterarguments are limited, by law, to the evidence and posture of the case *as set forth in the settled record.*

> [*Amicus curiae*] is allowed to file an amicus brief, within the page limits set by local rules, regarding any objections to the Report and Recommendation which are filed by the parties to this suit; however, *because it is not a party* to this suit, *it will not be permitted to file an Objection itself* and will be *limited to briefing only those issues raised by the parties pursuant to their Objections.*  Further [*amicus*] may not submit evidence and *may not attach documents* to its amicus brief.  [*Amicus'*] sole status in this proceeding is to assist the court with regard to the *issues raised by the parties* to the suit *based on the evidence submitted by them* in the suit.  To permit further participation would be, in effect, to grant [*amicus*] intervenor status, which will not be done[.]

*Parm v. Shumate*, No. CIV.A. 3-01-2624, 2006 WL 1228846, at *1 (W.D. La. May 1, 2006) (emphasis added) (unreported opinion citing opinions from the Second Circuit, Fifth Circuit, Ninth Circuit, and orders from several federal district courts).

C.  *Jurisdictional Issues Regarding* Amicus' *Filings*

*Amicus* was appointed "to defend the ruling of the trial court."  This Court ordered that *Amicus* "shall file an amicus curiae brief not exceeding 8,750 words in length within thirty days of the date of this order."  This Court granted Amicus' motion to extend time to file the *amicus curiae* brief until 3 July 2019.  *Amicus* filed three documents on 3 July 2019, the *amicus curiae* brief, a motion to dismiss

Plaintiff's appeal, and a "Motion to Seal Rule 9(b)(5) Supplement." *Amicus* filed a supplement to the record on 8 July 2019.

*Amicus* argues in the motion to dismiss that Plaintiff had voluntarily dismissed her Chapter 50B action on 31 May 2018, thereby divesting the trial court of jurisdiction to hear Plaintiff's claim and enter the 50B Order. However, this Court is without jurisdiction to consider *Amicus'* purported motion to dismiss Plaintiff's appeal, or the document *Amicus* requested be added to the record. As set out above, only parties to an action, personally or through their attorneys, have standing to participate in the litigation of an action.

Our appellate rules governing *amici curiae* are found in Rule 28(i): "Amicus Curiae Briefs." N.C. R. App. P. 28(i). "An amicus curiae may file a brief with the permission of the appellate court in which the appeal is docketed." *Id.* "A *party to the appeal* may file and serve a reply brief that responds to an amicus curiae brief no later than thirty days after having been served with the amicus curiae brief. . . . . The court *will not accept* a reply brief from an amicus curiae." N.C. R. App. P. 28(i)(6). "The court will allow a motion of an amicus curiae requesting permission to participate in oral argument only for extraordinary reasons." N.C. R. App. P. 28(i)(7). "An *appellee* may supplement the record with any materials pertinent to the issues presented on appeal, as provided in Rule 9(b)(5)." N.C. R. App. P. 28(c) (emphasis added). "Additional authorities discovered by *a party* after filing its brief may be

brought to the attention of the court by filing a memorandum thereof with the clerk of the court[.]" N.C. R. App. P. 28(g) (emphasis added). The Rules of Appellate Procedure (the "Rules") are, in the main, directed to the parties in the matter on appeal. The rights granted to *amici curiae* are limited to submitting briefs on pre-identified "issues of law to be addressed[,]" N.C. R. App. P. 28(i)(1), and, in extraordinary circumstances, participation in oral arguments, N.C. R. App. P. 28(i)(7). "Because the North Carolina Rules of Appellate Procedure generally speak in terms of actions which a 'party' to a proceeding must take on appeal, it is implicit that any appellate brief must be filed on behalf of one of those parties." *In re Estate of Tucci*, 104 N.C. App. 142, 148, 408 S.E.2d 859, 863 (1991). We hold that it is also implicit in the Rules that *amici curiae* are generally limited to the authority granted by N.C. R. App. P. 28(i), which does not include the authority to file motions substantively impacting the parties to the appeal, or otherwise acting on appeal with the powers solely granted to the parties. *Id.*; *see also Johnson v. Schultz*, 195 N.C. App. 161, 164, 671 S.E.2d 559, 562 (2009) (and cases cited), *aff'd and remanded*, 364 N.C. 90, 691 S.E.2d 701 (2010).

In the present case, neither Defendant, the State nor any *amicus curiae* was defending the constitutionality of N.C.G.S. § 50B-1(b)(6) by contesting Plaintiff's state constitution and Fourteenth Amendment arguments. *Amicus* did not have the authority or the standing to act as Defendant's attorney, present new arguments not

raised by either party, or file any motions in the action beyond those related to the Rule 28(i) requirements for *amici curiae*. Neither the mandate of this Court, nor the law, permitted *Amicus* to look outside the record settled by the parties for support of its briefed arguments, to make novel arguments, or to take any action reserved for party litigants. Only a party had standing to move this Court to amend the record or dismiss Plaintiff's appeal. To allow otherwise would be to place Plaintiff at a disadvantage not imposed on similarly situated appellants. *Leigh*, 535 F. Supp. at 422; *see also State of Mich.*, 940 F.2d at 164; *Hanan*, 868 F. Supp. at 1360 (this Court's decision on whether to appoint an *amicus curiae* depends in part on "whether participation by the amicus will be . . . helpful to the court and will not prejudice the parties").

This Court does not have the authority to give to an *amicus curiae* powers reserved to the parties. Appointment as an *amicus curiae* does not, and cannot, confer standing on the *amicus* to move this Court to dismiss an appeal, nor to alter the record, settled by the parties on appeal, in order to support that motion. In short, "*amicus curiae* has no standing to request relief not requested by the parties." *Newark Branch, N.A.A.C.P.*, 940 F.2d at 808-09 (citation omitted). Our Supreme Court has held: "A judgment *regular upon the face of the record, though irregular in fact*, requires evidence *aliunde* for impeachment. Such a judgment is voidable and not void, and may be opened or vacated after the end of the term only by *due*

87

*proceedings instituted by a proper person."* *Shaver*, 248 N.C. at 119, 102 S.E.2d at

795 (emphasis added) (citations omitted). As the Court in *Shaver* determined, the

judgment on review was

> regular upon its face. We conclude that the Superior Court
> . . . was without power to initiate on its own motion
> proceedings to vacate the judgment. Rather, it was the
> duty of the court to indulge *the legal presumption* that the
> *judgment [wa]s valid.* A judgment regular upon the face of
> the record is presumed to be valid until the contrary is
> shown in a *proper* proceeding.
>
> Moreover, it is to be noted that *an amicus curiae may not
> assume the place of a party in a legal action. Nor may he
> take over the management of a suit.* And he has *no right to
> institute proceedings therein.* He *takes the case as he finds
> it.*

*Id.* at 119–20, 102 S.E.2d at 796 (emphasis added) (citations omitted). Our Supreme

Court has recently reaffirmed this rule:

> "In appeals from the trial division of the General Court of
> Justice, review is solely upon the record on appeal, the
> verbatim transcript of proceedings, if one is designated,
> and any other items filed pursuant to [Rule 9 of the North
> Carolina Rules of Appellate Procedure]." N.C. R. App. P.
> 9(a). "Although the question of subject matter jurisdiction
> may be raised at any time . . . where the trial court has
> acted in a matter, 'every presumption not inconsistent with
> the record will be indulged in favor of jurisdiction. . . .'"
> *Cheape v. Town of Chapel Hill*, 320 N.C. 549, 557, 359
> S.E.2d 792, 797 (1987) (internal citations omitted) (quoting
> *Dellinger v. Clark*, 234 N.C. 419, 424, 67 S.E.2d 448, 452
> (1951)). Nothing else appearing, we apply "the *prima facie*
> presumption of rightful jurisdiction which arises from the
> fact that a court of general jurisdiction has acted in the
> matter." *Williamson v. Spivey*, 224 N.C. 311, 313, 30

> S.E.2d 46, 47 (1944) (citations omitted). As a result, "[t]he burden is on the *party* asserting want of jurisdiction to show such want."[13] *Dellinger*, 234 N.C. at 424, 67 S.E.2d at 452.

*In re N.T.*, 368 N.C. 705, 707, 782 S.E.2d 502, 503–04 (2016) (emphasis added); *see also Matter of S.E.*, 373 N.C. 360, 363–64, 838 S.E.2d 328, 331 (2020).

The 50B Order in this case is regular on its face. The trial court's jurisdiction to decide the matter was never challenged, and the record on appeal reveals no jurisdictional deficiency. Because *Amicus* is not a party to the action *Amicus* does not step into Defendant's shoes as appellee, and cannot litigate any matter in Plaintiff's action. Therefore, *Amicus* was without standing to take on the burden of proving a lack of jurisdiction. *Town of Midland v. Morris*, 209 N.C. App. 208, 224–25, 704 S.E.2d 329, 341 (2011) (citation and quotation marks omitted) ("Standing typically refers to the question of whether a particular litigant is a proper party to assert a legal position[,] and whether the party before the court [is] the appropriate one to assert the right in question."). If a person participates in an action without standing, the "Court does not have subject matter jurisdiction to hear the argument." *Id.* at 225, 704 S.E.2d at 341; *see also Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 52 (2002) (citing *Friends of Earth v. Laidlaw Env. S.*, 528 U.S. 167, 185, 145 L.Ed.2d 610, 629 (2000) ("a plaintiff must demonstrate

---

[13] In that *Amicus* is not a "party," *Amicus* cannot act as "the party asserting want of jurisdiction[.]" *Dellinger*, 234 N.C. at 424, 67 S.E.2d at 452 (citation omitted).

standing separately for each form of relief sought")); *Estate of Apple v. Com. Courier Express, Inc.*, 168 N.C. App. 175, 177, 607 S.E.2d 14, 16 (2005) (citation omitted) ("If a party does not have standing to bring a claim, a court has no subject matter jurisdiction to hear the claim.").

Because *Amicus* was without standing to file the motion to dismiss and the motion to amend the record on appeal, these motions are a "nullity" and must be dismissed as such. *Shaver*, 248 N.C. at 120, 102 S.E.2d at 796; *Morris*, 209 N.C. App. at 224–25, 704 S.E.2d at 341. Allowing the motions would also be improper because they would "inject[] an element of unfairness into the proceedings[.] [Plaintiff] in this case [is] entitled to have [her] contentions and arguments" considered as presented on appeal. *Leigh*, 535 F. Supp. at 422. Therefore, the motion to dismiss and motion to supplement the record are dismissed for lack of standing and subject matter jurisdiction—they are a nullity, and this Court has conducted our review under the presumption that the trial court's orders are correct. Further, because they were in reply to a nullity, and there is no authority to file a reply to a motion that does not exist, Plaintiff's responses to *Amicus'* motion to dismiss are also dismissed. The record includes only the settled record on appeal and any supplementation properly sought by Plaintiff. Therefore, this Court's review has been limited to the record as settled by the parties, Plaintiff's arguments on appeal, the arguments of the *amici*

*curiae* whose motions to file *amicus* briefs were granted by this Court, and the briefed arguments of *Amicus* that are responsive to Plaintiff's briefed arguments.

## VII. <u>Conclusion</u>

Because this opinion is subject to review by our Supreme Court, and there is always the potential for review of federal constitutional questions by the United States Supreme Court, we have decided to include alternative holdings. Further reason for this decision is that the Supreme Court's decisions in *Romer*, *Windsor*, *Lawrence*, and *Obergefell* strongly suggest the kind of statutory challenge before us, one based on Plaintiff's "minority" status, is subject to a particular kind of review—one that does not seek to apply the "rational basis," "intermediate scrutiny," "strict scrutiny" framework. Finally, the recently decided Supreme Court opinion of *Bostock* includes a thorough analysis resulting in the conclusion that discrimination based upon a person's "homosexuality" or "transgender status" is *always* also discrimination based on "sex," or gender. Therefore, applying *Bostock*, we conclude that equal protection challenges of a law based upon LGBTQ+ status are also challenges based upon "sex" or gender and, therefore, require at least "intermediate scrutiny." As it is unsettled which review is appropriate, or if there are multiple permissible reviews that may be applied, we have conducted review pursuant to all potentially applicable tests, and include alternative holdings for each. No matter the review applied, N.C.G.S. § 50B-1(b)(6) does not survive Plaintiff's due process and equal protection

challenges under either the North Carolina Constitution or the Constitution of the United States.

We therefore reverse the trial court's denial of Plaintiff's complaint for a Chapter 50B DVPO, and remand for entry of an appropriate order under Chapter 50B. The trial court shall apply N.C.G.S. § 50B-1(b)(6) as stating: "Are persons who are in a dating relationship or have been in a dating relationship." The holdings in this opinion shall apply to all those similarly situated with Plaintiff who are seeking a DVPO pursuant to Chapter 50B; that is, the "same-sex" or "opposite-sex" nature of their "dating relationships" shall not be a factor in the decision to grant or deny a petitioner's DVPO claim under the Act.

REVERSED AND REMANDED.

Judge BRYANT concurs.

Judge TYSON dissents with separate opinion.

No. COA18-1045 – *M.E. v. T.J.*

TYSON, Judge, dissenting.

The trial court was without and this Court possesses no jurisdiction to consider any issues on the merits of this appeal. Plaintiff's purported appeal is not properly before this Court because of: (1) Plaintiff's filing of a voluntary dismissal of the N.C. Gen. Stat. § 50B complaint, s*ee* N.C. Gen. Stat. § 50B-1(b)(6) (2019); (2) Plaintiff's failure to file a post-dismissal Rule 60 motion, *see* N.C. Gen. Stat. § 1A-1, Rule 60(b)(1) (2019); (3) Plaintiff's failure to argue and preserve any constitutional issue for appellate review; (4) Plaintiff's failure to join necessary parties, *see* N.C. Gen. Stat. § 1A-1, Rule 19(d) (2019); and, (5) Plaintiff's failure to comply with Rule 3 to invoke appellate review, *see* N.C. R. App. P. 3.

In addition to these five undisputed and unaddressed failures, no petition for writ of certiorari was filed to invoke appellate jurisdiction. *See* N.C. R. App. P. 21. Presuming jurisdiction does exist, Rule 2 is not requested nor invoked to suspend the appellate rules to review any merits. N.C. R. App. P. 2. There is no subject matter jurisdiction nor any other issues that are properly before this Court. This matter is properly dismissed. I respectfully dissent.

I. Background

On 31 May 2018 at 9:10 a.m., Plaintiff filed a complaint and motion for a domestic violence protective order ("DVPO") under N.C. Gen. Stat. § 50B-1(b)(6), using an AOC-CV-303 form which was assigned docket number 18 CV 600733 by a clerk of superior court. Plaintiff asserted, "There is not another court proceeding

pending in this or any other state." At 3:04 p.m. the same day, Plaintiff filed an additional complaint for a no-contact order under N.C. Gen. Stat. § 50C, using an AOC-CV-520 form, which was assigned docket number 18 CV 005088 by a clerk of superior court. The allegations in these two complaints were the same, but Plaintiff asserted and attested in her § 50C complaint that the parties were "co-workers." Eight minutes after filing her N.C. Gen. Stat. § 50C complaint, Plaintiff signed, dated, and filed an AOC-CV-405 form notice of voluntary dismissal of her prior § 50B complaint without prejudice under docket number 18 CV 600733.

While her complaint for a no-contact order under N.C. Gen. Stat. § 50C remained pending and without any explanation of the intervening circumstances or basis, Plaintiff or someone acting on her behalf filed a purported withdrawal of the completed dismissal of the § 50B complaint. The signed, dated, and file-stamped AOC-CV-405 notice of voluntary dismissal form was struck through diagonally, the handwritten word "Amended" was added to the top right-hand corner, and handwritten text was included: "I strike through this voluntary dismissal. I do not want to dismiss this action." None of these handwritten additions were signed, initialed, or dated. This paper was then filed with the clerk of superior court, and contains two separate file stamps. No new docket number was assigned upon the purported withdrawal of the dismissed complaint. Plaintiff was issued a no contact

order for stalking against Defendant under N.C. Gen. Stat. § 50C on 7 June 2018 by the same trial judge.

## II. Plaintiff's Voluntary Dismissal

### A. Standard of Review

"The issue of jurisdiction over the subject matter of an action may be raised at any time during the proceedings, *including on appeal.* This Court is required to dismiss an appeal *ex mero motu* when it determines the lower court was without jurisdiction to decide the issues." *McClure v. County of Jackson*, 185 N.C. App. 462, 469, 648 S.E.2d 546, 550 (2007) (emphasis supplied).

"Subject matter jurisdiction cannot be conferred upon a court by consent, waiver, or estoppel, and therefore failure to . . . object to the jurisdiction is immaterial." In *re T.R.P.*, 360 N.C. 588, 595, 636 S.E.2d 787, 793 (2006) (citations and internal quotation marks omitted). A court's subject matter jurisdiction is not invoked *sua sponte,* and is "never dependent upon the conduct of the parties" or inaction by the Court. *Feldman v. Feldman*, 236 N.C. 731, 734, 73 S.E.2d 865, 867 (1953).

### B. Effect of Dismissal

When Plaintiff signed and filed her voluntary dismissal of the N.C. Gen. Stat. § 50B-1(b)(6) complaint, the dismissal was complete and the court's jurisdiction over that action was extinguished upon filing. When a plaintiff filed a voluntary dismissal,

she "terminate[s] the action, leaving nothing in dispute[.]" *Teague v. Randolph Surgical Assoc.*, 129 N.C. App. 766, 773, 501 S.E.2d 382, 387 (1988). Plaintiff's signed and filed dismissal divested the district court of subject matter jurisdiction to proceed on that dismissed action. N.C. Gen. Stat. § 1A-1, Rule 41(a)(1) provides: "Subject to the provisions of Rule 23(c) and of any statute of this State, an action or any claim therein may be dismissed by the plaintiff without order of court (i) by filing a notice of dismissal at any time before the plaintiff rests his case[.]" N.C. Gen. Stat. § 1A-1, Rule 41(a)(1) (2019).

After Plaintiff's voluntary dismissal is filed, Plaintiff must file a new complaint for relief under N.C. Gen. Stat. § 50B-1(b)(6), to re-invoke the district court's jurisdiction under that statute, with a new complaint and docket number assigned, instead of filing an unsigned and undated purported "Amended" withdrawal of the properly signed, dated, and previously filed notice of dismissal form. *See id.*

### III. No Rule 60(b) Motion

As an alternative, to filing a new complaint, Plaintiff's counsel could have filed a Rule 60(b) motion to seek to revive the dismissed complaint. No Rule 60(b) motion was filed and the deadline for filing has expired. N.C. Gen. Stat. § 1A-1, Rule 60(b) (motion must be filed not later than one year after the order or proceeding was entered or taken). "[T]he one-year period for filing a Rule 60(b) motion is not tolled by the taking of an appeal from the original judgment." *Talbert v. Mauney*, 80 N.C.

App. 477, 479, 343 S.E.2d 5, 7 (1986). The dismissed action was not revived under this rule.

## IV. Commencement of Action

Plaintiff's filing of a purported withdrawal of her previously signed and filed notice of dismissal is not a refiling, commencement, or revival of the allegations of the original § 50B dismissed complaint. An "action is commenced by filing a complaint with the court." *See* N.C. Gen. Stat. § 1A-1, Rule 3 (2019).

The refiling of the purported amended dismissal, failed to comply with N.C. Gen. Stat. § 1A-1, Rule 7(b)(1) (2019) ("An application to the court for an order shall be by motion which, unless made during a hearing or trial or at a session at which a cause is on the calendar for that session, shall be made in writing, shall state with particularity the grounds therefore, and shall set for the relief or order sought.").

Plaintiff could have remedied the jurisdictional default by filing a new § 50B complaint, within the filing parameters of Rule 41, or a Rule 60(b) motion in the district court within one year of the filing of the voluntary dismissal. N.C. Gen. Stat. § 1A-1, Rule 41, Rule 60(b). She failed to do either.

The trial court and, consequently, this Court acquired no jurisdiction. Plaintiff's purported appeal is properly dismissed. *See Dogwood Dev. & Mgmt. Co., LLC v. White Oak Transp. Co.*, 362 N.C. 191, 197, 657 S.E.2d 361, 365 (2008) ("A

jurisdictional default, therefore, precludes the appellate court from acting in any manner other than to dismiss the appeal.").

## V. <u>Failure to Preserve</u>

During the purported N.C. Gen. Stat. § 50B-1(b)(6) hearing, Plaintiff's counsel argued:

> [Plaintiff] should be allowed to proceed with the Domestic Violence Protective Order . . . the statute, that 50B, is unconstitutional as its written post the same-sex marriage equality case from the Supreme Court in *Obergefell* and that there's no rational basis at this point to have a statute that limits dating relationships to folks of opposite sex.

The above quote is the total extent of Plaintiff's constitutional argument before the trial court.

The trial court responded: "Without a more expansive argument on constitutionality, I won't do it. I think there is room for that argument. I think that with some more presentation that maybe we could get there, but I don't think on the simple motion I'm ready to do that." The trial court sought to elicit more specific and additional arguments on constitutionality of the statute beyond a cryptic reference, which Plaintiff's counsel failed to argue or advance further. The trial court did not declare N.C. Gen. Stat. § 50B-1(b)(6) to be unconstitutional, which Plaintiff now purports to assert upon appeal.

For the first time on appeal, Plaintiff now seeks to invalidate the order on additional theories beyond her single reference to *Obergefell*. *Obergefell v. Hodges*,

576 U.S. 644, 192 L. Ed. 2d 609 (2015). These additional arguments were not raised nor argued before the trial court. Our Rules of Appellate Procedure require: "In order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent from the context." N.C. R. App. P. 10(a). Plaintiff's new arguments demonstrate her cryptic argument quoted above was "not apparent from the context." *Id.*

Until now, our Supreme Court and this Court have consistently applied the appellate rules and binding precedents to dismiss unpreserved and unargued constitutional issues sought to be asserted for the first time on appeal: "A constitutional issue not raised at trial will generally not be considered for the first time on appeal." *Anderson v. Assimos*, 356 N.C. 415, 416, 572 S.E.2d 101, 102 (2002). *See In re Cline*, 230 N.C. App. 11, 27, 749 S.E.2d 91, 102 (2013) ("Since this argument was not raised before the trial court, it is not properly before us on appeal."); *Fields v. McMahan*, 218 N.C. App. 417, 417, 722 S.E.2d 793, 793 (2012) ("Because plaintiff raises on appeal a constitutional argument which has not been presented and ruled upon by the trial court, we dismiss the appeal."); *Powell v. N.C. Dep't of Transp.*, 209 N.C. App. 284, 296, 704 S.E.2d 547, 555 (2011) ("Thus petitioner did not give the superior court the opportunity to consider and rule on the specific constitutional argument he now attempts to bring before this court.").

Plaintiff's cryptic reference to *Obergefell* failed to raise any facial or as-applied constitutional issue before the trial court or to preserve any issue for appellate review. The trial court requested counsel to assert and argue additional constitutional arguments. Plaintiff's counsel failed to provide any further arguments or authority. The district court correctly ruled Plaintiff had failed to assert any proper constitutional argument, had failed to carry her burden, and the § 50B statute was not unconstitutional.

The transcript and record on appeal is utterly devoid of any other constitutional argument. Plaintiff's arguments on purported additional constitutional grounds, asserted for the first time on appeal, were not raised before the trial court and are not preserved before this Court. N.C. R. App. P. 10(a). "A constitutional issue not raised at trial will generally not be considered for the first time on appeal." *Anderson*, 356 N.C. at 416, 572 S.E.2d at 102. This matter is properly dismissed.

### VI. <u>Failure to Join Necessary Parties</u>

Our General Statutes mandate:

> The Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State through the General Assembly, *must be joined* as defendants in any civil action challenging the validity of a North Carolina statute or provision of the North Carolina Constitution under State or federal law.

N.C. Gen. Stat. § 1A-1, Rule 19(d) (emphasis supplied).

Plaintiff challenges the constitutionality of N.C. Gen. Stat. § 50B-1(b)(6). Both the President *Pro Tempore* of the Senate and the Speaker of the House of Representatives are necessary parties and "must be joined as defendants" in the civil action. *Id.* The record shows no service upon nor mandatory joinder of these necessary parties.

Our Supreme Court held neither the district court, nor this Court, can address the underlying merits of Plaintiff's assertions until this mandatory joinder defect is cured. *See Booker v. Everhart*, 294 N.C. 146, 158, 240 S.E.2d 360, 367 (1978) ("Where, as here, a fatal defect of the parties is disclosed, the court should refuse to deal with the merits of the case until the absent parties are brought into the action, and in the absence of a proper motion by a competent person, the defect should be corrected by *ex mero motu* ruling of the court. Absence of necessary parties does not merit a nonsuit, instead, the court should order a continuance so as to provide a reasonable time for them to be brought in and plead.") (internal citations omitted).

The Speaker of the House of Representatives and the President *Pro Tempore* of the Senate "must be joined" as necessary parties. N.C. Gen. Stat. § 1A-1, Rule 19(d). *See also* N.C. Gen. Stat. § 1-72.2(b) (2019) ("The Speaker of the House of Representatives and the President Pro Tempore of the Senate, as agents of the State, by and through counsel of their choice, including private counsel, shall jointly have standing to intervene on behalf of the General Assembly as a party in any judicial

proceeding challenging a North Carolina statute or provision of the North Carolina Constitution."). Separate from and in addition to the lack of subject matter jurisdiction, no further action or review is proper until this statutory and mandatory defect is cured. *Booker*, 294 N.C. at 158, 240 S.E.2d at 367.

## VII. No Valid Notice of Appeal

Our Rules of Appellate Procedure provide: "The notice of appeal required to be filed and served . . . *shall specify the party* or parties taking the appeal; shall designate the judgment or order from which appeal is taken and the court to which appeal is taken; and *shall be signed* by counsel of record." N.C. R. App. P. 3(d) (emphasis supplied).

Our Rules of Appellate Procedure further provide:

> The body of the document *shall* at its close bear the printed name, post office address, telephone number, State Bar number, and e-mail address of counsel of record, and in addition and in the appropriate place, *the manuscript signature of counsel of record*. If the document has been filed electronically by use of the electronic filing site . . . the manuscript signature of counsel of record is not required.

N.C. R. App. P. 26(g)(3) (emphasis supplied).

Plaintiff's trial counsel's hard copy of the purported notice of appeal was filed with the clerk of superior court and bears no "manuscript signature." The signature line is left blank. An effective notice of appeal can only be filed with the clerk of superior court in traditional hard copy with a "manuscript signature of counsel of

record." *Id.* Counsel's lack of compliance with the mandatory signature requirement on the notice of appeal is no different from another Rule of Appellate Procedure requiring any counsel arguing before this Court must have signed the hard copy brief, or otherwise be barred from arguing. N.C. R. App. P. 33(a).

The subsequent electronic filing exceptions to this rule are not applicable to this case, nor do any of the Emergency Directives and Orders of the North Carolina Chief Justice for court operations during the COVID-19 pandemic waive or set aside this mandatory requirement. N.C. R. App. P. 26(g)(3).

Our Supreme Court has held a jurisdictional default occurs when the record fails "to contain a notice of appeal in compliance with Rule 3[.]" *Crowell Constructors, Inc. v. State ex rel. Cohen*, 328 N.C. 563, 563, 402 S.E.2d 407, 408 (1991). Plaintiff's counsel's mandatory "manuscript signature" is lacking and not contained on the filed notice of appeal. The purported notice fails to satisfy the express criteria that our appellate rules mandate to invoke appellate jurisdiction. N.C. R. App. P. 3(d); 26(g)(3). Our Supreme Court's and this Court's binding precedents mandate dismissal of the purported appeal for counsel's failure to sign and file an effective and compliant notice of appeal to invoke this Court's jurisdiction. *Dogwood*, 362 N.C. at 192, 657 S.E.2d at 365. This matter is properly dismissed.

VI. *Amicus Curiae*

The majority's opinion fails to review and entirely dismisses the arguments regarding subject matter jurisdiction raised by *amicus curiae* in its brief. This Court's appointed *amicus curiae* cited and advanced these determinative statutes, rules, and precedents in its brief, and during oral arguments before this Court.

Black's Law Dictionary defines *amicus curiae* as "[Latin 'friend of the court'] (17c) *Someone who* is not a party to a lawsuit but who petitions the court or *is requested by the court to file a brief in the action* because that person has a strong interest in the subject matter." *amicus curiae*, Black's Law Dictionary (11th ed. 2019) (emphasis supplied). The *amicus curiae* in this case was both invited and appointed by this Court by order entered 3 May 2019 to specifically "appear as court appointed *amicus curiae*," "defend the ruling of the trial court," "file a brief," and attended oral arguments. Appointed *amicus curiae* did not petition this Court for leave to submit a brief.

In the absence of any motion to strike by Plaintiff, the majority's opinion inexplicitly treats the specifically approved supplement containing the omitted notice of dismissal from the record on appeal as a nullity. This Court's order allowing and sealing of *amicus curiae's* filed Rule 9(b)(5) Supplement, is signed by a judge who joins the majority's opinion.

The sole contents of the *amicus curiae's* filed Rule 9(b)(5) Supplement is a document raising jurisdictional defects before the trial court in an *ex parte*

proceeding. This document in the Wake County Clerk of Court's file was unexplainedly and inextricably omitted from the Plaintiff's record on appeal. "In an *ex parte* proceeding, a *lawyer shall inform the tribunal of all material facts known* to the lawyer that will enable the tribunal to make an informed decision, *whether or not the facts are adverse.*" N.C. R. Prof. Conduct 3.3(d) (emphasis supplied). Citing Supreme Court precedents, this Court stated: "It is well-settled that an attorney's responsibilities extend not only to his client but also to the court[s]." *N.C. State Bar v. Key*, 189 N.C. App. 80, 85, 658 S.E.2d 493, 497 (2008) (citation omitted); *see also Smith v. Bryant*, 264 N.C. 208, 211, 141 S.E.2d 303, 306 (1965).

"The record on appeal and other testimonial and material evidence is the only 'evidence' this Court has to review the rulings of lower courts." *Hackos v. Smith*, 194 N.C. App. 532, 537, 669 S.E.2d 761, 764 (2008). *Amicus Curiae* was specifically appointed because this *ex parte* proceeding lacks the adversarial nature of typical court proceedings and the Defendant was neither being represented before the trial court nor on appeal. This Court shall insist upon the filing of a complete record on appeal, and certainly any document which is the basis of the purported appeal and which calls into question the Court's subject matter jurisdiction over the matter. *Id. Amicus curiae's* supplemental filing is vital and should have been included in the record on appeal. *Id.*

Presuming *amicus curiae* cannot move to dismiss the action, these reasoned arguments by this Court's designated appointee puts this Court on actual notice of the lack of subject matter jurisdiction, to reject Plaintiff's unasserted and unpreserved constitutional arguments, and to dismiss this wholly baseless appeal.

The absence of subject matter jurisdiction cannot be waived and can and should be raised for the first time on appeal, whether by opposing counsel or *sua sponte*. This Court must dismiss a purported action and appeal, *sua sponte*, upon the lack of subject matter jurisdiction. *See McClure*, 185 N.C. App. at 469, 648 S.E.2d at 550.

All cases cited by the majority's opinion to challenge this Court's issued order, involve an *amicus* who moved and sought leave to file a brief and are inapposite. The majority's opinion cites *Shaver v. Shaver*, 248 N.C. 113, 102 S.E.2d 791 (1958) wherein a trial court appointed an *amicus curiae* to re-open divorce proceedings closed ten years previously, because the trial court had learned the parties had not lived apart for the required two years prior to the filing. The block quote from *Shaver* refers to an *amicus curiae* challenging a ten year old judgment by motion to re-initiate the proceedings. *Id.* at 115, 102 S.E.2d at 793.

Here, the case was purportedly appealed to this Court by Plaintiff. The party before the trial court, the Defendant who received the benefit of the trial court's ruling, did not participate nor was represented by counsel. This Court appointed the

*amicus curiae* for a specific purpose: "to defend the ruling of the trial court." An inherent part of that appointment, to file a brief and appear at oral argument, would be to challenge and argue whether jurisdiction and preservation was present for the appellate court to hear or review a matter.

Unlike *amicus curiae* in *Shaver*, this Court's appointed *amicus* does not attempt to re-open long-settled litigation. The purported appeal was pending before this Court upon Plaintiff's unsigned, and ineffective attempt at withdrawal of her signed and filed notice of dismissal and her counsel's unsigned and ineffective notice of appeal prior to *amicus'* appointment.

Beyond asserting *amicus curiae* does not have the power to submit a motion to dismiss, the majority's opinion also asserts this Court's appointed *amicus curiae* does not have standing. In support of this notion, the majority's opinion cites *Town of Midland v. Morris*, 209 N.C. App. 208, 224-25, 704 S.E.2d 329, 341 (2011). *Town of Midland* involved a wholly inapposite condemnation action wherein the statutory provision utilized only provided a cause of action to a county, not to a landowner.

Neither *Town of Midland* nor any of the cases listed in the string citation involve the standing of an *amicus curiae,* who was specifically appointed to "file a brief" and appear at oral argument by order of this Court "to defend the ruling of the trial court['s]" presumed to be correct judgment and order. *Neuse River Found., Inc. v. Smithfield Foods, Inc.*, 155 N.C. App. 110, 114, 574 S.E.2d 48, 52 (2002); *Friends*

*of Earth v. Laidlaw Env. S.*, 528 U.S. 167, 185, 145 L. Ed. 2d 610, 629 (2000); and

*Estate of Apple v. Commercial Courier Express, Inc.*, 168 N.C. App. 175, 177, 607

S.E.2d 14, 16 (2005).

The appointed *amicus*, a sworn officer of the court and experienced appellate counsel, who was expressly appointed by order of this Court on 3 May 2019, to specifically "defend the ruling of the trial court," served with dignity and exceptional knowledge, and has fulfilled his assigned duties *pro bono*. He earned and is due recognition and gratitude for his able service to this Court and to the Bar.

### VII. Conclusion

The trial court was divested of subject matter jurisdiction when Plaintiff signed, entered, and filed her voluntary notice of dismissal of the N.C. Gen. Stat. § 50B-1(b)(6) complaint. Plaintiff's counsel's attempt to re-file an unsigned, undated, and purported hand-notated withdrawal of her properly filed and entered dismissal form did not revive that complaint and failed to commence or allege any basis of relief required in a new complaint under Rule 3 and Rule 41. No new action was commenced, nor new docket number assigned. No Rule 60 motion was filed and the time for Plaintiff to have filed has elapsed. *See Talbert*, 80 N.C. App. at 479, 343 S.E.2d at 7.

No signed notice of appeal was filed to invoke appellate jurisdiction to allow appellate review of the dismissed complaint. Appellate review of unpreserved, new

and non-argued constitutional issues also violates our binding precedents, rules, and procedures. *See Anderson*, 356 N.C. at 416, 572 S.E.2d at 102; *Fields*, 218 N.C. App. at 417, 722 S.E.2d at 793. The Speaker of the House of Representatives and the President *Pro Tempore* of the Senate were not served and "must be joined" as necessary parties. N.C. Gen. Stat. 1A-1, Rule 19(d).

This Court is also not vested with appellate jurisdiction due to counsel's unsigned and defective notice of appeal filed with the clerk of superior court. N.C. R. App. P. 3; 26(g)(3); *Crowell*, 328 N.C. at 563, 402 S.E.2d at 408.

No petition for writ of certiorari to invoke appellate jurisdiction has been filed under Rule 21, and, presuming jurisdiction exists, no motion to invoke Rule 2 to suspend the appellate rules was argued. These jurisdictional defaults and waivers preclude any appellate review. *Crowell*, 328 N.C. at 563, 402 S.E.2d at 408.

No appeal is pending before this Court. Any attempt at analysis beyond examining jurisdiction, preservation, proper joinder and compliance with the Rules of Civil and Rules of Appellate Procedure is *ultra vires,* a notion, and a nullity. I respectfully dissent.